# CHARLESTON.

ALEX R. WATSON *v.* BUCKHANNON RIVER COAL CO.

Submitted November 13, 1923.    Decided December 4, 1923.

1. CONTRACTS—*Duty of Court to Construe Written Contract and Instruct Jury As to Finding Under its Construction.*

It is the duty of the trial court to construe a written contract which is the basis of the suit, if it be susceptible to construction, and instruct the jury as to their finding under such construction. (p. 173).

2. SAME—EVIDENCE—*Circumstances Surrounding Parties at Execution May Always be Shown; Unambiguous Written Con-*

*tract Cannot be Varied by Parol Evidence Changing Plain Expressed Intent; Practical Construction Will Not Change Clear Expressed Intent; Terms of Written Contract Cannot be Varied by Extraneous Evidence.*

The circumstances surrounding the parties at the time of the making of a written contract may always be shown; but where the writing is plain, definite and unambiguous it cannot be varied by parol evidence showing facts which might have the effect of changing the plain intent expressed by the writing; nor will practical construction by the parties change the clear intent expressed by the writing. The writing is the repository of what the parties meant, and cannot be varied by extraneous evidence.  (p. 173).

3. SAME—*Must Always be Considered As a Whole; Written Contract Will be Construed to Give Effect to Its Main Purpose, Where Possible.*

The writing must always be considered as a whole; and if possible it will be so construed as to give effect to the main general purpose.  (p. 173).

4.   SAME—EVIDENCE—*Parol Evidence Admissible to Explain Uncertain and Ambiguous Writing; Where Parol Evidence Admissible to Explain Writing Not Conflicting, Construction for Court; Where Parol Evidence, Admissible to Explain Writing Conflicting on Material Point, Question for Jury.*

While the general rule is that the construction of a writing is for the court; yet where the meaning is uncertain and ambiguous, parol evidence is admissible to show the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently.  If the parol evidence be not in conflict, the court must construe the writing; but if it be conflicting on a material point necessary to interpretation of the writing, then the question of its meaning should be left to the jury under proper hypothetical instructions.  (p. 180).

5.   EVIDENCE—*Parol Evidence Admissible to Explain Uncertain and Ambiguous Writing; Declarations, Conversations, and Interlocutions of Parties to Writing at or Before Execution Inadmissible.*

Where the writing is ambiguous, oral evidence may be introduced as to the situation of the parties, surrounding circumstances and subsequent acts in carrying it out; but the declarations, conversations and interlocutions of the parties at or before the execution of the writing are not admissible.  (p. 181).

6. SALES—*Measure of Damages for Breach of Contract of Sale and Delivery of Coal Stated.*

In an action to recover damages for the breach of a contract of sale and delivery of coal, the contract and breach being established, the damages is the difference between the contract price and the market price at the time when the coal should have been delivered, to which the jury may add interest at the legal rate from the stipulated time for delivery. (p. 181).

Error to Circuit Court, Upshur County.

Action by Alex R. Watson against the Buckhannon River Coal Company. Judgment for plaintiff, and defendant brings error.

*Reversed and remanded.*

*J. M. N. Downes, Lackey, Spurgeon & Lackey,* and *Poffenbarger, Blue & Dayton,* for plaintiff in error.

*Law & McCue,* and *Young & McWhorter,* for defendant in error.

LIVELY, JUDGE:

This writ is to review a judgment for $25,244.37, rendered on September 27, 1922, in favor of plaintiff below.

The action is assumpsit for breach of a written contract of sale and purchase of coal executed the 29th of May, 1916, and modified or supplemented by a writing dated the 17th day of October, 1916. The proper construction of this original and supplemental contract is the question upon which practically all of the assignments of error are based. The lower court construed the contract as contended for by plaintiff, and at the conclusion of the evidence gave instructions to the jury which practically directed them to find a verdict for plaintiff in accordance with the court's construction of the contract. The coal company, defendant below, plaintiff in error, placed quite a different construction upon the contract from that given by the court; and insisted that its construction is the proper one; or, at least, that the meaning of the contract should have been left to the jury, in view of the situation of the parties and their practical interpretation thereof as developed by the evidence, and of the conflict in

the evidence; and that they should have been properly instructed as to what the interpretation would be, based upon their finding of facts; in other words, the terms of the contract being indefinite as to the intention of the parties, the construction thereof depended upon the facts, and the court should have charged the jury telling them what would be the true construction of the instrument on the different state of facts which might be found by them from the evidence.

Did the court properly construe the contract? This is the storm center of the case. By the contract of May 29, 1916, the coal company sold to Watson 50,000 tons of its Adrian three-quarter screened coal for delivery between June 1, 1916, and January 1, 1917, at 95 cents per gross ton; the shipments to be equally distributed throughout the period for delivery. Watson was to pay on the 15th of each month for coal shipped in the previous month; the coal was to be consigned by instructions from Watson, the seller not to be liable in any way for the coal or freight after the coal left the mine. During the period of delivery Watson was to have the refusal of the nut or slack coal which defendant had to offer at the price of 90 cents per ton f. o. b. mines. The agreement for the purchase of slack is practically eliminated from consideration, and has an incidental bearing only. The agreement was made subject to car supply, classification facilities, strikes, accidents, and delays beyond the control of either party. On June 26, 1916, Watson contracted with Indian Run Coal Company by which he sold it 25,000 tons of 1½ inch lump coal to be shipped from the mines at Adrian at $1.15 per net ton, shipments to be made of approximately 5,000 tons per month as long as the contract was in force, the buyer to designate the delivery and equipment and routing. This contract was to remain in force until December 1, 1916, and if any of the coal had not been shipped at that time it would be taken by the buyer at its election. The contract was made subject to strikes, accidents, car supply, etc., same as set out in the above contract of May 29th between the parties litigant. The existence of this contract was known to defendant, and accounts for the clause "western shipment" in the October 17th contract (below set out) and has

an important bearing upon the interpretation of the contract.

The price of coal began to rise about the first of July. On October 17, 1916, the coal company had delivered 19,997.18 tons of lump coal and 2,141.01 tons of slack. It became apparent from shortage of car supply and other causes that the 50,000 tons could not be delivered at that rate before January 1st. There remained 30,002.82 tons and at the rate of delivery up to that time about 11,000 would be delivered, leaving 20,000 tons, in round numbers, not delivered on January 1, 1917.

The coal company had a prior contract or contracts on which it was shipping some of its coal, of which Watson had notice at the time of the first contract, and on which it was receiving an average price of about 80 cents per ton. This, with car shortage, lessened the tonnage delivered. Of this 19,997.18 tons of coal delivered, Watson had applied 9,071.78 tons to the Indian Run contract, denominated in the record as "western shipment," leaving 15,928.22 tons to be delivered by him before December 1, 1916, or at the option of the Indian Run Coal Company to take, after that date. Watson was urging delivery of more coal on his contract. This being the situation on October 17, 1916, Watson met with the directors of the coal company and talked over this situation, the unexpected rise in price, and the supplemental contract was then made, afterwards reduced to writing by the president of the company, T. S. Lackey. That agreement in full is as follows:

> "Supplemental Memoranda of Agreement between the Buckhannon River Coal Company and Alex R. Watson relative to the sale of 50,000 tons of coal.
>
> At a meeting of the Board of Directors of the Buckhannon River Coal Company held at the office of T. S. Lackey, 52 East Main St., Uniontown, Pa., October 17th, 1916, Mr. Alex R. Watson being present, the following was agreed to:—
>
> 1st. That the tonnage undelivered at this date of a certain contract for 25,000 tons lump coal sold by Mr. Watson for western shipment shall be delivered at the contract price of 95c per ton.
>
> 2nd. The company also to furnish 1,000 tons of slack

at 95c per ton. All slack delivered to Watson to count on the contract tonnage.

3rd. The balance of the 50,000 tons not already delivered at this date to be sold by Watson, the Company to receive therefor 95c per ton, the contract price; Watson to receive 5c per ton if sold at $1.00 per ton and the company and Watson to share equally the difference between the said $1.00 per ton and the net price for which said coal is sold.

4th. Said contract subject to the above memorandum is to remain in full force and effect until the full 50,000 tons have been delivered to the said Alex R. Watson or shipped to his order.

5th. Gross ton is intended in each instance.

(Signed)   T. S. LACKEY,
President Buckhannon River Coal Co.''

The proper construction of this writing is the meat of this controversy. Between the date of this modified contract and February 17, 1917, when the alleged breach occurred, and further deliveries and payments ceased, the coal company delivered upon Watson's orders 15,867.06 tons of coal, which included 1,009.12 tons of slack. On November 20th Watson sent his check for $2,570.47, and a note for $1,000 to pay for coal delivered at 95 cents, the basic price; on December 15th he sent his check for $2,738.95 and a note for $2,000 for coal shipped on his account in the month of November. This was at 95 cents per ton; and on January 17, 1917, a like settlement was made and $3,433.65 sent. Of the 15,876.06 tons delivered after October 17th Watson applied 2,334.91 tons on the "western contract" and had sold the remainder, 12,523.03 tons in the open market at the high price of coal then prevailing, somewhere in the neighborhood of $4.00 or $5.00 a ton. The construction placed upon the contract of October 17th by defendant was that the balance of the undelivered tonnage of 25,000 tons of lump coal sold by Watson for "western shipment", and which he applied on that shipment, was to be furnished to him at 95 cents per ton; but that profits from coal which he deflected from the "western shipment" and sold in the open market at the market price, was to be equally divided if sold above $1.00 per ton. Brooke, secretary and treasurer, of defendant com-

95 W. Va.

pany, testified that in the months of November and December he had asked Watson over the telephone to render a statement of the coal he had sold on the open market, if any, and of the part of the profits thereon coming to defendant. These conversations were denied by Watson. He says no demand of this character was made until January 17, 1917, when he received a letter from Lackey demanding a statement of the amount of coal he had applied on the "western contract" and what he had sold in the market, and demanding an accounting and settlement. On February 17th defendant again made demand by telephone for full accounting and settlement for all coal sold by plaintiff on the market since October 17th. Watson then made up a statement showing the defendant's share of profits for January, which amounted to $2,037.85, but on the 19th of that month notified defendant of a mistake in the amount owing to plaintiff on the profits for January which he corrected, and made the amount $6,248.48 as the share of the January profits of the coal company on the coal sold on the market. No report or accounting for the previous months on the profit sharing basis was made. Watson's explanation of the accounting for the profits on coal sold on the market in January is that Brooke had complained that the company was hard up for money, and it was done as a gratuity and to relieve the company of its financial straits and that later shipments of the balance of the 50,000 tons would be applied on the balance of 25,000 tons for "western shipment". Check for the coal sold at 95 cents was sent to the coal company; but the item of $6,248.48 profits was credited to it on his books in order to relieve the coal company's financial difficulty. The amount remitted was $3,-833.05 on the 95 cents basis as hereinbefore stated. In this letter Watson says he was going over the books and hoped to have a credit memorandum covering the amount due on coal shipped from Adrian "as per our arrangements." On the 19th day of February the coal company demanded of Watson over the telephone what it was to get for the coal sold that day, and insisted upon its right to know. Watson denied that right, and thereupon the break in the relations of the

parties was consummated.  Brooke told him that he would get no more coal.  Plaintiff wired that he had stopped payment of the check for $3,833.05 sent on the 15th of February; afterwards he withdrew the credit of $6,248.48 for profits of coal sold on the market in January.  After that time no more shipping orders were given and no demand made for delivery of coal.  Contractual fulfillment mutually ceased. On February 19th defendant addressed Watson a letter in which its interpretation of the contract was insisted upon, and advised him of its purpose and readiness to carry out the contract as so interpreted.  On the 21st inst. following plaintiff addressed the coal company giving his theory of the proper construction of the contract and claiming that he was to account for no profits made until the balance of the 25,000 tons on his "western shipment" (15,928.22 tons) had been furnished him, whether he applied the tonnage received by him to the "western shipment" or whether he sold it on the market; notifying them that he had allowed them credit for $6,248.48 for their profits for the coal sold on the market in January because of special arrangements with Mr. Brooke; notified defendant that he had employed counsel to institute suit against it for $50,000 damages for breach of their contract.  This action then followed.  It was stayed by a chancery suit on the part of plaintiff against Watson in the circuit court of Marion County for discovery of the coal which he had   sold   on   the   market,   and   the   coal   which   he had applied to the "western shipment" after the modified contract of October 17, 1916.  This information was obtained, and that chancery suit dismissed.  This suit then proceeded to the judgment above indicated.

The controversy over the failure of plaintiff to deliver nut or slack coal on the first contract was eliminated by the trial court.  It was stipulated that the balance undelivered of the 50,000 tons originally contracted for amounted to 14,135.76 tons at the time the relations between the parties ceased on February 19, 1917.  The plaintiff claimed as damages five cents per ton on this undelivered tonnage, amounting to $706.79, and damages for failing to deliver that tonnage assessment of which was submitted to the jury under the in-

structions of the court. Watson admitted that he owed defendant on the 95 cents a ton basis for coal furnished, a balance of $5,318.83. The average price of coal on the market at the time when the coal should have been delivered was shown to be $4.40, by C. E. Pool, and one-half of the profits thereon (subtracting $1.00) would be the amount to which plaintiff was entitled under the instructions of the court. Taking these figures as a basis, the one-half of the profits on the 14,135.76 tons would amount to $24,030.79, and the five cents per ton would amount to $706.69, in all $24,737.58. Subtracting the amount owing by Watson $5,318.83, would leave a balance of $19,418.75, to which the jury evidently added five years interest under the instructions of the court, making the amount of the verdict $25,444.37, the exact amount which they returned. Of course it is a speculation as to how the jury arrived at this amount; but it was practically what the court instructed them to find. Defendant by its pleadings claimed the amount admitted to be due by Watson on the 95 cents per ton basis, and claimed one-half of the profits made by him on all coal sold in the open market (excluding the 2,334.91 tons shipped by him on the ''western contract'') after October 17, 1916, which amount of profits, as shown by the detailed statement from Watson's books obtained by the bill of discovery, amounted to something like $15,064.95. It claimed that Watson had breached the contract, by refusing to account and pay for profits each month, wherefore, it was under no obligation to furnish the 14,135.76 tons of the 50,000 tons remaining undelivered after that time. The court instructed the jury not to take into consideration the counter claim of defendant in this regard.

Tersely stated, plaintiff contends that the contract of October 17th means that it was the duty of defendant to furnish him 15,928.22 tons at the basic price of 95 cents whether he applied it on the ''western shipment'' or sold it in the open market; that it was no concern of defendant what he did with that coal or what price he received, if he sold it. He was entitled to it at 95 cents. The lower court so construed the writing. Defendant contended, in the court below, that the true meaning and interpretation is that the coal which Watson

delivered on the "western shipment" was to be furnished by it at 95 cents; but all he diverted from the western contract and sold on the open market was to be accounted for on the profit sharing basis if sold for more than $1.00 per ton. To make plaintiff's interpretation plain and beyond dispute, he would write into the 3rd paragraph the words which we insert in parenthesis, making that clause read: "The balance of the 50,000 tons (*after subtracting the undelivered tonnage to be delivered at 95 cents as set out in paragraph 1 hereof*) not already delivered at this date to be sold by Watson," etc. shall be on a profit sharing basis. He contends that the word "balance" means what remains of the 50,000 tons after 15,-928.22 tons have been subtracted from the remaining 30,-002.82 tons undelivered at that date. The court so construed the contract. To make defendant's interpretation plain and beyond dispute it would write into the first paragraph the words in parenthesis as follows: "That the tonnage undelivered at this date of a certain contract of 25,000 tons lump coal sold by Mr. Watson for western shipment (*and which he shall actually apply on that western contract or shipment*) shall be delivered at the contract price of 95 cents per ton." This construction the lower court denied.

Defendant makes the contention, in this court, that by the plain terms of the writing it is entitled to a share in the profits derived from sales of all coal delivered by it to plaintiff in point of law or fact, on and after October 17, 1916, including what was applied on the "western contract." It is argued that paragraph 3 plainly includes the tonnage referred to in paragraph 1; that it is the balance of the 50,000 tons *not then delivered*, not the balance thereof less the coal referred to in the first paragraph; that the subject of profit sharing is the 30,002.82 tons then undelivered. If we take the original contract and the modification of October 17th alone, without any knowledge of the situation of the parties or any extrinsic facts, it would be difficult to determine which construction would interpret the true intent of the parties. "Where a contract is clear, plain, definite and unambiguous it can not be varied by parol evidence of facts and circumstances known to the parties, which might have induced intent different from

that expressed, or contemporaneous or subsequent conduct inconsistent with terms used.'' *Petty* v. *Fuel Co.,* 76 W. Va. 268. It is elementary that where the writing is clear and unambiguous, the intent must be gleaned from the contract' alone, and extraneous matter, although potent and persuasive of a different intent, will not be considered. Have we such a contract here? Invoking the rule of construction, that a subsequent clause irreconcilable with and repugnant to a former clause and repugnant to the general purpose and intent of the contract will be rejected, plaintiff says that clause 3 if inconsistent with or repugnant to clause 1 should be rejected in so far as it is repugnant, citing *Jones* v. *Island Creek,* 79 W. Va. 532. It is contended that clause 1 was dealing with a certain amount of coal (the balance of a western contract) fixing the tonnage which should be delivered at 95 cents, using the reference to the undelivered tonnage on that ''western shipment'' as a yard stick to determine how much coal should be furnished at the base price of 95 cents and that defendant had no interest or concern in how or to whom Watson sold this tonnage. But that was not the only purpose of the modified contract. Plaintiff's customers were pressing him for deliveries and threatening litigation; it was apparent that only about 11,000 tons of the remainder of the 50,000 tons ($30,002.82) would be delivered at the then rate of delivery before January 1, 1917, and to stimulate better delivery and insure that the whole balance on the original contract would be delivered without reference to a time limit, Watson agreed to a modification by which defendant would receive participation in the advance in prices. Defendant was mostly interested in participation of the profits on a rising market. Coal was then about $5.00 a ton. There were mutual benefits to be derived; considerations moving each party. It can not be concluded that the delivery of the balance of the ''western shipment'' was the general or paramount purpose of the modified contract. The place it occupies in the writing, being in the first clause, does not necessarily make it the paramount and controlling purpose. The contract must be considered by inspection of all of its clauses and every part should be construed with reference to the whole, in order to give effect to

its general purpose. Williston on Contracts, sec. 618. Is clause 3 repugnant to and irreconcilable with clause 1? The latter does not say in terms that the coal company shall not participate in the profits on the "western shipment"; whereas, the former (clause 3) says in terms that the coal company shall participate in profits on the "balance of the 50,000 tons not already then delivered to be sold by Watson," if sold above $1.00 per ton. However, clause 1 refers to the 95 cents as the "contract" price, indicating that no change with reference to that coal (the western shipment) was intended; while clause 3 designates the profit sharing coal as the balance of the 50,000 tons not already delivered at this date *to be sold* by Watson. The "western shipment" (balance of the 25,000 tons) had at that time already been sold by Watson to the Indian Run Coal Company. These observations are made for the purpose of accentuating the point that it would be difficult to interpret the intention of the parties and the meaning of the contract from the writing alone. Where the intent is not clear from the instrument alone, it is proper that the court should have aid from the situation of the parties, the surrounding circumstances and the acts of the parties as indicative of the intent.

A strong factor in determining the meaning of a contract which is not clear in its terms is the practical construction given by the parties who made it. Lord Sugden once said. "Tell me what the parties have done under a contract and I will tell you what that contract means." When a writing is clear and unambiguous an erroneous construction placed upon it by the parties will not govern, but when there is doubt as to its proper meaning, the construction which the parties have put upon it by their acts is entitled to great consideration. *Bank* v. *McVeigh*, 32 Grat. 531; *Clark* v. *Sayers*, 55 W. Va. 512; *Camden* v. *McCoy*, 48 W. Va. 577; *Gibney* v. *Fitzsimmons*, 45 W. Va. 334. Defendant has apparently treated this contract as not giving it participation in the profit on the coal shipped by Watson on the western contract. No claim of that character is discernible before litigation was instituted or during the progress of the case in the lower court. It has been set up after the case has reached this court. Defendant's

demands for an accounting, both verbal and written, relate to the coal sold on the market. Its set off and counter claim do not include profits on the "western shipment," and it stipulates that the amount recoverable under its set off is $16,-698.95, which does not include profits on western shipments. In its bill for discovery of the disposition of the coal by Watson it did not claim part of the profits of the coal applied to western shipment, only on that coal diverted from the western contract and sold on the market, construing the contract in that regard. Generally, where there is an adjudication between parties by a court having jurisdiction of the parties and matters involved, it is final and conclusive not only as to the matters actually determined but as to every other matter which the parties might have litigated as incident thereto and coming within the purview of the subject matter of the litigation. *Koontz* v. *Mylius,* 77 W. Va. 499; *Tracy* v. *Shumate,* 22 W. Va. 474, 15 R. C. L. 969. In another suit it is doubtful if the claim now made for part of the "western shipment" profits, if asserted, would be countenanced. But of course, this adjudication is now questioned by this writ. Defendant, knowing that it should set up all its legitimate defenses on penalty of being thereafter estopped by failure to do so, would not likely have overlooked this claim now set up. Its practical construction of the contract, exonerated Watson from payment of the profits, if any, on the "western shipment." We think its construction of the contract in that respect is the true construction. The terms of the Indian Run Coal Company contract for the 25,000 tons to be shipped from the Adrian mines (defendant's mines) the price therefor $1.15 per ton, and the limited time for delivery, December 1st following, were known to the parties, and had its influence on the making and wording of the modified contract.

Passing the question of division of profits on the tonnage actually delivered on the western contract, we come to consideration of the main question litigated in the lower court; namely, should the contract be so construed as to give defendant participation in the profits of all coal delivered after October 17th and sold on the market above $1.00, excluding that which was actually delivered to discharge the "western shipment?" As we have pointed out, it is difficult to de-

termine this question either in the affirmative or negative from the terms of the contract. The contract is ambiguous on that point and susceptible to the two constructions respectively contended for. The parties by their respective interpretations would write into clauses 1 and 3 the explanatory phrases hereinbefore set out. Again we must call to aid extraneous evidence, the situation of the parties, the rise in price of coal, the surrounding circumstances and the subsequent acts of the parties. "The circumstances under which a writing was made may be always shown. The question the court is seeking to answer is the meaning of the writing at the time and place it was made, and all the surrounding circumstances at time necessarily throw light upon the meaning of the contract." Williston on Contracts, sec. 618. Plaintiff, before October 17th had received approximately 20,000 tons, of which he had applied about 9,000 tons in discharge of his Indian Run, or western contract. He had about six weeks to furnish the remainder on that contract, and it was apparent that if he applied all that he received at the average rate of delivery, he would not have enough to fulfill that contract before December 1st, the date of its expiration. He could only continue that contract after that date at the option of the purchaser, and the fact is that he furnished only a few cars after that date and ceased entirely to ship on the western contract after the 8th of December. Of the 15,876.06 tons received after November 17th he applied 2,334.91 tons only on that contract. Was it within contemplation of the parties that all of the western contract would be fulfilled and discharged after the modified contract was made? Or, did they contemplate what was afterwards actually done in that respect? Was Watson to first take the remaining tonnage measured by the balance of the western contract and sell it wherever he chose, and run the risk of damages on the western contract, if asserted? What right had defendant to complain, if he did so? On the other hand, defendant being concerned in reaping a profit on the abnormal price of coal in the market, would likely modify its contract with this purpose in mind, with a view of participating in all coal sold on the open market. The memorandum of the result of the meeting on November 17th is not clearly expressive of the intent either

way. Nor can we say that the situation of the parties and
the circumstances under which the writing was made would
be conclusive of the intention. Even if the contract should
be construed so as to give Watson the right to take the 15,-
928.22 tons remaining undelivered on the western contract at
95 cents irrespective of what disposition he made of it,
whether on the western contract or on the open market, there
is nothing in the terms of the writing which would fix the
time when that tonnage should be shipped, whether before or
after the deliveries to be sold on the open market. The price
of coal on the market was then about $5.00 per ton, which
both parties knew. Was it contemplated that this high
market was then to be taken advantage of for the benefit of
each, or was participation in the profits to be delayed, and
dependent upon an uncertain fluctuating future market? The
writing is silent as to the time of delivery for market sales.
As before stated, at the time of the supplemental contract it
was known by both parties that Watson was consigning a por-
tion of the coal to the western contract, and the remainder
he was selling on the market. Out of about 20,000 tons fur-
nished at that date he had applied in round numbers 9,000
tons to the "western shipment," and about 11,000 tons he had
sold on the market. Might it not be reasonably concluded
that this ratio would continue? If so, the market sales would
accrue to defendant's benefit if it was intended that it should
reap a profit on all coal sold on the market, whenever sold.
The situation and circumstances being inconclusive of inten-
tion and failing to warrant a full basis for construction,
the court can look to the contemporaneous and practical con-
struction placed upon it by the parties. The weight of prac-
tical construction of an ambiguous writing is universally
recognized, and applied. What did the parties do in carrying
out the October 17th contract? What aid do we find from
their acts? The subsequent acts of the parties are found in
the record, introduced, no doubt, to assist the court and jury
to arrive at the intent of the writing. The court evidently
concluded that these subsequent acts confirmed the interpre-
tation contended for by plaintiff. If the admissible evidence
*is free from conflict, or the conflict is of minor importance,
the interpretation of intent remains for the court.* *Mylius* v.

*Raine-Andrews Lumber Co.*, 69 W. Va. 346. But we find the evidence in conflict. Payments were to be made on the 15th of each month for coal shipped the preceding month. On November 20th Watson made a statement for the preceding month, (delivered the 17th of November) and sent his check for $2,570.47 in settlement on the 95 cents basis; on December 15th, and again on January 17th, 1917, he made settlements on the 95 cents basis. There was no complaint in writing of these settlements, which tends to show that defendant acquiesced in payment on that basis, thus buttressing the construction contended for by plaintiff. However, Brooke, the secretary and treasurer of defendant, says he made verbal requests in November, December and January for statements and settlements of the tonnage sold by Watson on the open market. Watson denied that any such requests or demands were made. On January 17th defendant's president made a very positive demand on him by letter for such statement and settlement, stating that Brooke had reported that he had made such demand and had received no reply. He made no response to this demand until February 15th when he gave information by letter that he was entering a credit in favor of defendant for its share of the profits of the coal sold on the market in the month of January, saying nothing about the profits for previous months, or whether any coal had been sold on the market in the previous months. This letter unexplained would evidence agreement on his part with defendant's construction of the contract; but he says this credit for January profits was the result of solicitation on Brooke's part on the plea of financial stress in the affairs of defendant coal company; that it was a gratuitous act in the nature of a loan to be repaid at the completion of the 50,000 ton contract. Brooke says no such request was made on the plea of financial stress; that he had demanded what was owing to his company under its contract. It may be observed that defendant had no way of knowing what coal Watson applied on his "western shipment", or what tonnage he was selling on the market; and later was forced to a bill of discovery to ascertain this data. The practical construction given by the parties, we think, would be a deciding factor in determining the true construction. Clause 1 and clause 3 of the contract are in

terms contradictory, rendering the contract ambiguous; the situation of the parties and the surrounding circumstances are inconclusive of either interpretation asserted by the parties. The subsequent acts to which the rule of practical construction can be applied depend on conflicting evidence. One side affirms, the other denies. Shall this conflicting evidence be solved by the court, or jury? We think it should have been submitted hypothetically to the jury; and if they found that defendant by its acts had construed the contract as interpreted and construed by plaintiff, then they should so find, and if plaintiff had, by his acts, construed and interpreted the contract as contended for by defendant the verdict should be in accordance with that construction; all under instructions from the court as to the law under either finding.

There is abundant authority for the proposition that where ambiguity cannot be solved by reference to other parts of the contract and the surrounding circumstances and acts of the parties in carrying out the contract are controverted, the court should charge the jury hypothetically as to the true interpretation. *Goddard* v. *Foster,* 17 Wall. 123; 21 Law. Ed. 589; *Luse* v. *Martin,* 215 Fed. 28; *Rosenthal* v. *Ogden,* 50 Neb. 219, where the court said: "But if the construction must depend upon proof of other and extrinsic facts, then those questions of fact should be submitted to the jury under proper instructions from the court." Citing *Begg* v. *Forbes,* 30 Eng. Law & Eq. 508; *Etting* v. *U. S. Bank,* 11 Wheat. 74; *First National Bank* v. *Dana,* 79 N. Y. 108; *Edelman* v. *Yeasel,* 27 Pa. St. 26. *Newberry* v. *Durand,* 87 Mo. App. 290, where it was said: "Where an instrument is ambiguous in any of its terms and the ambiguity can not be solved by reference to the other parts of it, and the surrounding circumstances are controverted, as here, by the evidence, the court should charge the jury hypothetically as to the interpretation thereof. The determination by the jury of the question the one way or the other, would determine the intention of the parties, and hence the interpretation of the contract." In *Blocher* v. *Mayer Brothers Co.,* 127 Minn. 241, where the contract was ambiguous and the parol evidence in explanation not being conclusive of the intention of the parties the construction of the contract was submitted

to the jury. See *State* v. *Patterson,* 68 Me. 473. In *Camp* v. *Wilson,* 97˙ Va. 265, the court held that the construction which the parties have put upon a contract is entitled to great consideration, and said: "what construction has been so placed is a question of fact, and, in an action at law, is to be determined by a jury."

It follows that the instructions given for plaintiff, construing the contract as contended for by him, without reference to the question of the practical construction given by the parties and the surrounding circumstances, were erroneous.

Defendant offered the testimony of Lackey and other witnesses to detail the conversations of the parties at the meeting of October 17th relative to the contract of that date, and to show what agreement was made; the court rejected this proffered testimony, and this rejection is assigned as error. This evidence was properly rejected. It is well established that where a contract is ambiguous, oral evidence is admissible to show the situation of the parties, the circumstances surrounding them, what brought about the contract and their subsequent acts in pursuance of the contract, in order to give the court aid in arriving at their intention in making it; "but evidence cannot be received to show their declarations, conversations or interlocutions before or after execution of the contract." *Lewis* v. *Flour & Feed Co.,* 90 W. Va. 471, 477; *Snyder* v. *Robinett,* 78 W. Va. 88; *Uhl* v. *R. R. Co.,* 51 W. Va. 106. Error is assigned because the court instructed the jury to find for plaintiff five cents per gross ton upon 14,135.76 tons and a further sum equal to one-half of the difference between $1.00 per gross ton on said 14,135.76 tons and the price at which such coal could have been purchased on the open market by Watson during the time such deliveries reasonably in due course of business could have been made; and deduct the amount which Watson owed ($5,318.83) to plaintiff, then add to the remainder interest at the rate of 6% from the time as nearly as may be when such deliveries should so reasonably have been made, to the date of the verdict. The error alleged to be is the direction to add interest, it being asserted that interest on the damages occasioned by breach of an executory

contract is not allowed by way of compensation. We do not think this assignment well taken. The Virginia courts have consistently held that interest on damages occasioned by breach of such contract may be allowed as compensation, beginning with *Merryman* v. *Criddle,* 4 Mun. 542, decided in 1815. In assessing damages for breach of contract the ascertainment of compensation to the party injured is the cardinal principle, the object being to put the injured party in such circumstances as he would have been in had the other party carried out his part of the contract. The actual loss directly flowing from the breach of the contract is the quantum of damages. *Hurxthal* v. *Boom Co.,* 53 W. Va. 89; *Sterling Organ Co.* v. *House,* 25 W. Va. 64. Justice Winslow, in a Wisconsin case, said: "It is well settled by the preponderance of authority that there are cases for breach of contract and cases sounding in tort, where the damages are wholly unliquidated, but where they may be fixed by known and reasonably certain market values or other definite standards, where interest is to be allowed from the time of the breach or the commission of the injury. * * * * ; the principle being that the plaintiff would not be fully compensated unless he received, not only the value of the thing lost, but received it, as nearly as may be, of the date of his loss." Suth. Dam. sec. 347. When property sold and not delivered has not been paid for, interest is allowed on the difference between the contract and the market price. *Barrow* v. *Reab,* 9 How. 366, 13 L. Ed. 177. In *Dana* v. *Fiedler,* 12 N. Y. 40, the court said: "Interest is a necessary item in the estimate of damages in this class of cases. The party is entitled, on the day of performance, to the property agreed to be delivered; if it is not delivered the law gives as the measure of compensation then due the difference between the contract and market prices. If he is not also entitled to interest from that time as matter of law, this contradictory result follows, that, while an indemnity is professedly given, the law adopts such a mode of ascertaining its amount, that the longer a party is delayed in obtaining it, the greater shall its inadequacy become."

Defendant's bill of exceptions No. 4 relates to introduction of evidence for purposes of proving plaintiff's damages, if

any.   This assignment is not pressed in the argument.   This evidence shows the market price of coal in February, March, April and May, when the deliveries of coal would have been made if the contract had been carried to completion.   We perceive no error in the introduction of this testimony, assuming that plaintiff is entitled to damages for non-delivery of the coal under the contract.   The difference between the market price and the contract price at the time of delivery fixes the quantum of damages.

The judgment will be reversed, the verdict set aside, a new trial awarded, and the case remanded.

*Reversed and remanded.*