Pervis M. Bates

*v.*

The Board of Education of the County of Mineral, *Et Al.*

(No. 10197)

Submitted September 7, 1949. Decided September 27, 1949.

Lovins, Judge, not participating; Riley, Judge, dissenting.

*T. G. Nutter, C. E. Kimbrough, Sr., D. W. Ambrose,* for petitioner.

*D. C. Hott,* for defendants.

Fox, Judge:

In this proceeding in mandamus, wherein the original jurisdiction of this Court is invoked, Pervis M. Bates, hereinafter referred to as "relator," seeks to compel the defendant, The Board of Education of the County of Mineral, hereinafter referred to as the "board," and H. L. Idleman, Superintendent of Schools of said county to "* * * recognize him as a teacher in the public schools of said Mineral County, and for the school year of 1949-50 * * * " and "* * * to permit him to carry out his continuing contract * * *" alleged in his petition and for general relief. The facts on which this proceeding is predicated, as disclosed by the petition and the answer of the respondents filed herein, are as follows:

Effective July 1, 1940, there was issued to the relator a teacher's certificate under authority of Code, 18-7-15, authorizing him to teach the subject of industrial arts in the public schools of this State. The certificate states that "having met the certification requirements in the special fields named below," a certificate termed "high school certificate" was authorized, but, as stated above, was limited to the teaching of industrial arts. It was provided therein that the same should be valid until the first day of July, 1945, but it appears to have been renewed from time to time, and no question is raised as to the validity of the said certificate as of the date when this controversy arose.

On July 1, 1940, what is known as a "teacher's continuing contract of employment" was entered into between the board and the relator, pursuant to the provisions of Code, 18-7-1, as amended by Chapter 53, Acts of the Legislature, 1939. The statute under which said contract was executed reads as follows:

> "Before entering upon their duties, all teachers shall execute a contract with their boards of education, which contract shall state the salary to be paid and shall be in the form prescribed by the state superintendent of schools. Every such contract shall be signed by the teacher and by the president and secretary of the board of education, and when so signed shall be filed, together with the certificate of the teacher, by the secretary in the office of the board.
>
> "A teacher's contract, under this section, shall be a continuing contract of employment and shall remain in full force and effect except as modified by mutual consent of the school board and the teacher, unless and until terminated with written notice, stating cause or causes, to the teacher, by a majority vote of the full membership of the board before April first of the then current year, or by written resignation of the teacher before that date. Such termination shall take effect at the close of the school year in which the contract is so terminated: * * *. *Provided further,* That a continuing contract shall not operate to prevent a teacher's dismissal based upon the lack of need for the teacher's services pursuant to the provisions of law relating to the allocation of teachers and pupil-teacher ratios. But in case of such dismissal, the teachers so dismissed shall be placed upon a preferred list in the order of their length of service, and the school board shall give due consideration to such list and order if and when vacancies or need occur."

Some confusion arises as to the exact provisions of the contract on which the relator relies. He filed with his petition, as Exhibit No. 1, what purports to be a copy of the contract he signed on July 1, 1940, but there is contained in said exhibit in Subsection (h) thereof, the following language: "The expression 'cause or causes' as in

this paragraph used shall mean failure on the part of the teacher to fulfill this contract or violation on the part of the teacher of a lawful provision thereof."

In the answer of the respondents, there is filed a photostatic copy of the contract of July 1, 1940, which bears the signatures of the president of the board, the secretary of the board, and that of relator, Pervis M. Bates. In that contract Subsection (h) reads:

"(h) That, in pursuance of Section 1, Article 7, Chapter 18 of the Code of West Virginia, as amended by Chapter 53, Acts of the Legislature 1939, this contract is a continuing contract of employment and shall remain in full force and effect, subject to all the provisions herein set forth, except as modified by mutual consent of the party of the first part and the party of the second part, unless and until terminated with written notice, stating cause or causes, to the party of the second part, by a majority vote of the full membership of the party of the first part before April first of the then current year, or by written resignation of the party of the second part before that date, and that such termination shall take effect at the close of the school year in which this contract is so terminated; but this contract may be terminated at any time by mutual consent of the party of the first part and the party of the second part."

The confusion probably arises from the fact that by Code, 18-7-1, it is provided that "* * * all teachers shall execute a contract with their boards of education, which contract * * * shall be in the form prescribed by the state superintendent of schools"; and it is quite apparent that subsequent to July 1, 1940, and before this proceeding was instituted, the state superintendent of schools had modified the form of the "Teacher's Continuing Contract of Employment" by adding the language quoted above as to the meaning of the expression "cause or causes." In our opinion, relator is bound by the contract of July 1, 1940, a photostatic copy, of which is filed with the answer of the respondents, and which is certified by the state superintendent of schools as the form of contract approved by him.

In the contract of July 1, 1940, Subsection (j) reads as follows:

"(j) That this contract shall not operate to prevent the dismissal of the party of the second part based upon the lack of need for the services of the party of the second part pursuant to the provisions of law relating to the allocation of teachers and pupil-teacher ratios; but in case of the dismissal of the party of the second part on account of the lack of need of the services of the party of the second part pursuant to the provisions of law relating to the allocation of teachers and pupil-teacher ratios, the party of the second part shall be placed upon a preferred list in the order of the length of services performed by the teachers employed by the party of the first part, and the party of the first part shall give due consideration of such list and order if and when vacancies or need occur.";

and the same contains in substance the provisions of Code, 18-7-1, quoted above. Section 1, aforesaid, was amended by Chapter 47, Acts of the Legislature, 1949, but the amendments made do not in any wise affect the question raised in the proceeding at bar, and, therefore, need not be considered.

According to relator's petition, he continued to teach in Howard High School, in Mineral County, from the beginning of the school year of 1940, until the end of the school year 1948-49, except for a period of approximately three and one-half years, during which time he was in the Armed Services. The petition also alleges that notwithstanding the fact that his certificate limited him to teaching industrial arts, he, as a matter of fact, was permitted and required to teach other subjects in said high school, such as plane geometry, algebra, seventh and eighth grade mathematics, physical science, general science, and physical education. The answer of the respondents admits this to be true; but denies the allegation of the petition that relator's services in teaching the subjects not embraced within his certificate were satisfactory. There is no proof on this point.

In November, 1947, as alleged in respondents' answer, the state supervisor of negro schools recommended to the board that it employ a science teacher in Howard High School, because no member of the staff, as then constituted, was qualified or certified to teach such courses. Following this recommendation, the board met on March 11, 1949, to consider its action with respect to Howard High School for the ensuing school year of 1949-50. At that time it was determined that the net enrollment for the year 1948-49 at Howard High School was fifty-four pupils, and that, pursuant to the policy, alleged in the answer of the respondent board, adopted for the high schools of Mineral County of following a pupil-teacher ratio of thirty pupils to one teacher, by unanimous vote, the board determined to dispense with the services of petitioner, in order that a person qualified to teach courses other than industrial arts could be employed, presumably to avoid a further departure from that policy. In this connection it is pointed out that three teachers had been assigned to Howard High School, notwithstanding the pupil-teacher ratio referred to above; and on March 21, 1949, relator was notified by letter, written by the secretary of the board, that "Due to the fact that the Mineral County Board of Education plans to offer more courses in Howard School in 1949-50 and due to your certification in Manual Arts only, we will not be able to use your services for the school year of 1949-50." On receipt of this letter, the relator consulted counsel, some correspondence ensued between counsel and the board, and finally this proceeding was instituted.

Our decision must rest upon the interpretation of the contract of July 1, 1940. In that contract, Subsection (h) plainly provides that the contract is a continuing one, and should remain in force, except as modified by mutual consent of the parties "unless and until terminated with written notice, stating cause or causes to the party of the second part." A majority of the full membership of the board was required to effect such termination, and notice was required to be given prior to the first day of April of the then current school year, which, in view of the

statute, we assume to be the first day of April, 1949. We are unable to give consideration to the definition of the expression "cause or causes." It apparently was embodied in later contracts of employment. According to the plain provisions of the contract signed by relator, the contract could be terminated upon notice with a statement of the cause or causes therefor. Of course, the cause or causes referred to must be advanced in good faith. We think the notice was given as the statute requires, and that the causes for the action of the board were stated in plain language, and, on their face, appear sufficient to justify the action of the board. The relator could not have been in any wise misled as to the meaning thereof.

Furthermore, we think the provisions of Subsection (j), quoted above, saved to the board the right to dispense with the services of a teacher on account of lack of need for his services. In the very nature of things, situations frequently arise where competent teachers exceed the demand for their services, and it would be strange indeed if a board of education lacks the power to dispense with the services of teachers who are not needed. We do not mean by this to say that the services of a teacher engaged under a lawful continuing contract should be dispensed with capriciously or arbitrarily, or the teacher dealt with in bad faith; but in a case where, in seeking to improve the efficiency of a school, it becomes necessary to dispense with the services of a particular teacher, this Court is not inclined to substitute its judgment for that of the board of education. Where the services of a teacher are dispensed with in such circumstances, he is required to be placed upon a preferred list, and to be later employed where need for his services arises. Relator does not ask for this status, but the statute so provides and, if requested to do so, the relator should be so placed by the board.

We have been cited to the cases of *Neal* v. *Board,* 116 W. Va. 435, 181 S. E. 541; *White* v. *Board,* 117 W. Va. 114, 184 S. E. 264; *Pond* v. *Parsons,* 117 W. Va. 777, 188 S. E. 232; and we have considered *Rowan* v. *Board,* 125 W. Va.

406, 24 S. E. 2d 583. These cases all refer to situations where a teacher, holding a continuing contract of employment, has been assigned to a particular school. It was held in those cases that a teacher could not be transferred from that school to another, except in cases of emergency, or for strictly regulatory purposes. So far as we know, the power of a board of education to dispense with the services of a teacher holding a continuing contract has not been heretofore presented to this Court in its present form. That question differs widely from the rights of a teacher who has been once assigned to a particular teaching position, for a board of education has very wide power as to the assignment of teachers to particular schools.

In the case of *Weaver v. Board of Education,* 128 W. Va. 42, 35 S. E. 2d 679, this Court held: "Mandamus does not lie to compel a board of education and a county superintendent of schools to recognize a person as a teacher in a particular school who has not been assigned to such school by the superintendent with the approval of the board." That was a case where the relator held a life certificate as a teacher in the public schools of this State, and who was assigned to a grade school at Grantsville in 1942, and taught in that school for the school years 1942-43 and 1943-44. At a meeting of the board held on August 2, 1944, relator was assigned to teach in another school, and the holding made in the case was based upon her allegation that she was transferred from the Grantsville school to the other school, which was some distance from her residence, and that teaching in that school would involve great difficulties and expensive transportation. Ordinarily, there would be no question as to the proper use of mandamus in enforcing plain legal rights existing under a contract held by a teacher; but we have not understood that a teacher's continuing contract of employment entitles a teacher to a position in any particular school. We do understand that the assignment of teachers to particular schools is a matter within the sound discretion of the board of education of the county, to be made upon the recommendation of the superintendent of schools, and

that courts are not justified in interfering with such assignments, except in cases where capricious, arbitrary or fraudulent conduct is involved.

It must be apparent that it would be unwise for this Court to indulge in interference in the disputes which must necessarily arise between some of the thousands of teachers in West Virginia, and the respective boards of education of the fifty-five counties of the State, in respect to the employment of teachers, and their assignments. This Court is well aware of the difficulties surrounding the functioning of the several boards, and of the fact that the peculiar circumstances in the communities affected generally guide the actions of the boards of education. Our policy has been, and is, to leave to local boards the settlement of these problems, and we are not disposed to depart therefrom. Of course, in cases where boards deny teachers their legal rights, by misconstruction of the statutes, or by capricious, arbitrary or fraudulent conduct, this Court will interfere. In the case at bar we see no evidence of such conduct on the part of the board here involved; nor anything to indicate that the course it pursued in the matter here involved was prompted by any motive other than a desire to promote the best interest of Howard High School.

For the reasons stated above, the peremptory writ prayed for will be denied.

*Writ denied.*

RILEY, JUDGE, dissenting:

With deference, I dissent from the majority opinion. In doing so, I do not disagree with the positions taken in the majority opinion that (1) This Court ordinarily will not interfere in disputes which necessarily arise among teachers of this State and the respective county boards of education; (2) that the assignment of teachers to particular schools is a matter within the sound discretion of a board of education to be made upon the recommendation of the superintendent of schools, as held in *Weaver* v. *The Board of Education of Calhoun County*, 128 W.

Va. 42, 35 S. E. (2d) 679; (3) that the board of education of Mineral County is not guilty of capriciousness or bad faith with reference to relator as was found to exist in the cases of *Neal* v. *Board of Education of Putnam County,* 116 W. Va. 435, 181 S. E. 541; *White* v. *Board of Education of Lincoln County,* 117 W. Va. 114, 184 S. E. 264, 103 A. L. R. 1376; *Pond* v. *Parsons,* 117 W. Va. 777, 188 S. E. 232; and *Rowan* v. *Board of Education of Logan County,* 125 W. Va. 406, 24 S. E. (2d) 583; and (4) that the board of education in dismissing relator or in failing to renew his continuous contract for the ensuing school year was activated by the best of motives and what was thought to be in the interest of the school system of Mineral County.

Nevertheless, I dissent. The relator here is not seeking to require the respondents to assign him to any particular school, where there is more than one school in the county in which he can teach; if he were, there would be no merit in his petition. In *Weaver* v. *The Board of Education of The County of Calhoun, supra,* syllabus, this Court held: "Mandamus does not lie to compel a county board of education and a county superintendent of schools to recognize a person as a teacher in a particular school who has not been assigned to such school by the superintendent with the approval of the board." Howard High School, in which relator taught, under a continuing contract, from the school term beginning 1940 until the end of the school year 1948-49, with the exception of a period of approximately three and one-half years during which relator was in the armed services, is the only high school in Mineral County available for negro children and in which relator could teach. It follows that the fact that, under Subsection (j) of the contract of July 1, 1940, he may be entitled to "be placed upon a preferred list in the order of the length of services performed by the teachers employed" by the board and that the board "shall give due consideration of such list and order if and when vacancies or need occur," is of little moment for such privilege will not benefit relator in the least. This record portrays that, notwithstanding relator had a high school certificate limited to the teaching of industrial arts, he taught, evidently

with the permission and approval of the board of education and the county superintendent of schools, other subjects such as plain geometry, algebra, seventh and eighth grade mathematics, physical science, general science and physical education; and though respondents' answer denies the allegations of relator's petition that his services in teaching subjects, not embraced in his certificate, were satisfactory, there is no proof, as the majority opinion states, in this record that relator's services in this regard were, in fact, unsatisfactory.

Relator's contract of July 1, 1940 was what is known as a "Teacher's Continuing Contract of Employment" and was entered into by the contracting parties pursuant to the provisions of Code, 18-7-1, as amended by Chapter 53, Acts of the Legislature, 1939, which provides in part: "A teacher's contract, under this section, shall be a continuing contract of employment and shall remain in full force and effect except as modified by mutual consent of the school board and the teacher, unless and until terminated with written notice, stating cause or causes, to the teacher, by a majority vote of the full membership of the board before April first of the then current year, or by written resignation of the teacher before that date." The foregoing language of the statute was incorporated verbatim in the contract of July 1, 1940 except that the words "party of the second part" are substituted for the word "teacher." The contract further provides in Subsection (p) that the contract "shall terminate if at the beginning of any school year the party of the second part does not hold a valid teacher's certificate covering the period of such term; * * *." But relator here held a valid high school teacher's certificate, though it was limited as hereinbefore set forth, from the time the contract was executed, July 1, 1940, until his services were terminated at the end of the 1948-49 school year.

In my opinion, the clause contained in the instant contract, providing for the termination of the contract "with written notice, stating cause or causes" for termination, is indefinite and ambiguous but because the clause is a

part of the contract it cannot be discarded or ignored. If the words in question were interpreted unreasonably and without regard to the security of the members of the teaching profession in this State in their employment as teachers, then a teacher, notwithstanding his length of service or qualification, could be dismissed arbitrarily and at the whim of any, if such there is, politically minded board of education. Because, in the instant regard, the contract is, in fact, ambiguous, I think the rule of practical construction should be applied here. Though such construction will not change the clear intent expressed in a contract (*Watson* v. *Buckhannon River Coal Co.,* 95 W. Va. 164, 120 S. E. 390), this Court "will adopt the construction which the parties to an ambiguous contract, by their conduct and express agreement during performance, have placed upon it." *Summit Coal Company* v. *Raleigh Smokeless Fuel Company,* 99 W. Va. 11, pt. 1 syl., 128 S. E. 298. See also, *Osage Gas Co.* v. *Cleveland & Morgantown Coal Co.,* 101 W. Va. 675, pt. 4 syl., 133 S. E. 388. Here the relator and the board of education, in fact, gave a practical construction to the ambiguous provisions of the contract when the former, under his limited certificate, through quite a number of years, rendered, evidently at the instance and request of the board, teaching services in subjects not embraced in his certificate, and the latter continued to accept such services and repeatedly renewed relator's continuing contract. Moreover, the state superintendent of schools, when he caused to be incorporated in all later contracts, the explanatory language "the expression 'cause or causes' as in this paragraph shall mean failure on the part of the teacher to fulfill this contract or violation on the part of the teacher of a lawful provision thereof.", placed a practical construction on the terms "cause or causes." In view of this practical construction, I am unable to agree with the majority opinion.

The majority opinion says that Subsection (j) of the contract filed with respondents' answer "saved to the board the right to dispense with the services of a teacher on account of lack of need for his services." The contract and the statute, (Section 1, Chapter 53, Acts of the Legis-

lature, 1939) in my opinion, furnish no such support. True, the statute provides "That a continuing contract shall not operate to prevent a teacher's dismissal based upon the lack of need for the teacher's services *pursuant to the provisions of law relating to the allocation of teachers and pupil-teacher ratios.*" (Italics supplied.) Chapter 9, Article IX, Section 6, Acts of the Legislature, Extraordinary Session, 1933, contained a provision for a pupil-teacher ratio in the following language: "The total number of needed teachers in any subdistrict established by the board shall be determined by dividing the number of pupils in average daily attendance during the preceding year by eighteen, in districts with an average daily attendance of one to five per square mile; by twenty-two, in districts having an average daily attendance of six to nine per square mile; by twenty-five, in districts having an average attendance of ten to nineteen per square mile; by thirty, in districts having an average daily attendance of twenty to thirty-nine per square mile; and by thirty-eight, in districts with an average daily attendance of forty or more per square mile; * * *." This provision of the statute was reenacted in Chapter 39, Article IX, Section 6, Acts of the Legislature, Second Extraordinary Session, 1933.

But, with the amendment contained in the Acts of the Legislature, Regular Session, 1939, the statutory provision as to the establishment of a pupil-teacher relation was omitted from the statutory law of this State. See Michie's West Virginia Code, 1937, Chapter 18, Article 9, Section 6, which contains the last above quoted statutory provision and Michie's Code, 1943, Chapter 18, Article 9, Section 6, in which the provision as to the allocation of teachers on a pupil-teacher ratio is omitted from the statute. In these circumstances, it appears that the provision contained in Code, 18-7-1, as amended by Section 1, Chapter 53, Acts of the West Virginia Legislature, 1939, relied upon in the majority opinion, to the effect "That a continuing contract shall not operate to prevent a teacher's dismissal based upon the lack of need for the teacher's services pursuant to the provisions of law relating to the allocation of teach-

ers and pupil-teacher ratios." is meaningless and has no statutory basis, and will not ground relator's dismissal for the reasons suggested in the majority opinion.

This record does not disclose that relator failed to fulfill his contract or that he violated any lawful provision thereof in view of the practical construction placed on the contract through a long course of years by the contracting parties and the state superintendent himself. I do not think that the "informal Pupil-Teacher ratio for high schools of thirty students for each teacher" should stand in the way of the practical construction of the ambiguous part of the contract by the contracting parties and the state superintendent. In passing, I venture to say that as a practical matter a pupil-teacher ratio can not always be invoked and used over an entire county where, as here, there is only one school, such as Howard High School, in which the enrollment is small but in which the students need all the facilities required for a good high school education. Why, during the course of years in which relator taught in Howard High School, did the board ignore the informal pupil-teacher ratio, which it alleges it established, and on which it now seems to rely to sustain relator's dismissal? The board, of course, so far as this record discloses, was acting in good faith and in what was thought to be for the best interests of Howard High School and the student body thereof. Personally, I have no doubt that they were not activated by any capricious political or personal motives. But, in my opinion, by their action in dismissing relator, which has the approval of the majority of this Court, the board ignored the practical construction which it through many years has placed on the ambiguous terms of relator's contract and thereby they have made a serious inroad in the norm which underlies the continuing contract which was designed for the security of the teaching profession of this State in their employment. In my opinion, relator has been dismissed without just cause. Therefore, I would award the writ.