# CHARLESTON.

HOLDRED COLLIERIES OF WEST VIRGINIA v. BOONE COUNTY COAL
CORPORATION.

Submitted May 21, 1924. Decided September 9, 1924.

1. ELECTRICITY—*Coal Company's Contract to Furnish Power to
Lessees Held Not Subject to Regulation.*

A coal company owning a large area of coal lands sub-
divided them, and at various times leased the subdivisions
to divers lessees for development. In its lease it agreed
to erect or cause to be erected an electric power plant, cen-
trally located, from which electric power should be sold and
delivered to the respective lessees at such point as should
mutually be agreed upon between the lessor and the lessee,
if such point be other than at the mines of the lessee. The
coal company was not then engaged in public utility service,
though within the period the leases were being made it or-
ganized a subsidiary company and caused it to construct and
operate an electric power plant for the purpose of furnishing
electric power to its lessees, pursuant to the terms of the
leases. *Held*, that the company's contract to furnish electric
power to its lessees was a private contract, in which the pub-
lic had no concern, and was therefore not subject to public
service regulation. (p. 113).

(Electricity, 20 C. J. § 23).

2. MINES AND MINERALS—*Assignee of Coal Mine Lease Held En-
titled to Recover Difference Between Agreed Electric Power
Rates and Those it Was Compelled to Pay.*

One of the coal mining lessees entered into a contract with
the subsidiary power company for its supply of power pur-
suant to the terms of the lease. The coal company joined
therein to evidence its assent, and expressly agreed that the
contract should not be construed as a waiver of the coal
company's obligation to furnish electric power under the
lease. Under this contract the power company furnished
power for a considerable period, but, by reason of its having
extended its service to the public generally, it was declared
by the Public Service Commission to be a public utility.
Afterward the lessee assigned its lease to the plaintiff, the
lessor joining therein to evidence its assent, and expressly
agreeing that the covenants of the lease should continue in
full force as between the lessor and the assignee, and the
power company thereafter furnished power to the assignee,
at rates within the terms of the lease, until the power com-

97 W. Va.

pany upon its application, was allowed by the Public Service Commission to increase its rates beyond the maximum fixed in the coal mining lease; thereupon the assignee requested its lessor to furnish power pursuant to and at the rate prescribed by its lease. Upon its refusal to do so the assignee is entitled to recover from its lessor the difference between the maximum rate fixed in its lease and the rate it was compelled to pay. (p. 116).

(Mines and Minerals, 27 Cyc, p. 700 [1926 Anno]).

3. SAME—*Lessor Contracting to Furnish Electric Power not to be Relieved From Obligation Because Becoming Burdensome.*

The contract to furnish electric power being possible of performance the lessor cannot be relieved from its obligation merely because it has become burdensome by reason of increased costs. (p. 113).

(Mines and Minerals, 27 Cyc, p. 700 [1926 Anno]).

4. CONTRACTS—*Practical Legal Construction by Parties of Ambiguous Contract Controlling.*

Where the terms of a contract are of doubtful meaning, a practical construction placed thereon by the acts of the parties, if consistent with legal rules, is controlling. (p.117).

(Contracts, 13 C. J. § 517).

NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.

Error to Circuit Court, Kanawha County.

Action by the Holdred Collieries of West Virginia against the Boone County Coal Corporation. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Price, Smith & Spilman,* for plaintiff in error.

*Brown, Jackson & Knight, Geo. S. Couch,* and *Harold A. Ritz,* for defendant in error.

MEREDITH, PRESIDENT:

Defendant complains of a judgment for $7167.48 rendered in an action of assumpsit, which was tried by the court in lieu of a jury.

In 1911 the Boone County Coal Corporation owned about 29000 acres of coal lands located in Logan County. About that time it appears to have divided this large area into

various smaller tracts for the purpose of leasing them to individuals and corporations for development. Divers leases were made from time to time, and among them was one to Spruce Valley Coal Company, dated January 1, 1913, covering a tract of about 1200 acres. It runs for a period of twenty-seven years, with the privilege of renewal for a term of ten or twenty years. It contains many covenants, but the one upon which this action is based is found in Article 15, and is as follows:

> "Article 15. The lessor agrees to erect or cause to be erected an electric power plant, centrally located, from which they shall sell to the lessee electric power delivered to such point as shall be mutually agreed upon, if such point be other than at the mines of the lessee. The price to be agreed upon, which shall not be for more than $2\frac{1}{2}$c per KW hour of direct current as measured by an approved meter to be supplied by the lessor, provided, however, that the minimum charge after one year from the date hereof shall be $1.00 per month per KW of installation."

This action was brought to recover damages for defendant's failure to comply with the article quoted. Shortly after the execution of the lease, the Spruce Valley Coal Company began and later completed a modern coal mining plant on the leasehold, and equipped it for operation by electric power. Sometime prior thereto the defendant had caused to be organized an electric power company, known as the Spruce Fork Company, and this company had constructed a power plant, centrally located, at Sharples; from this plant electric power was furnished to defendant's various lessees. On January 1, 1914, the Spruce Valley Coal Company entered into a contract with the Spruce Fork Company for electric power for the operation of its mine. This contract was to run for two years; while it does not appear to have been renewed, it seems to have been treated as continuing beyond the two year period. It was also executed by Boone County Coal Corporation as evidence of its assent and of guaranty to its lessee that the execution of the contract should not be construed as a waiver of the lessor's obligation under article 15 of the lease. The

rates prescribed in the contract conformed to the provisions
of article 15. On July 5, 1917, Spruce Valley Coal Company,
the lessee, assigned its leasehold to the plaintiff. The de-
fendant, the lessor, joined in the assignment and agreed there-
in that the covenants of the lease should remain unchanged,
but should continue to be in full force and effect as between
the defendant lessor, Boone County Coal Corporation, and
the plaintiff assignee, Holdred Collieries. The Spruce Fork
Company was a subsidiary of the defendant company; it con-
tinued to furnish electric power to Spruce Valley Coal Com-
pany under its contract until July 6, 1914, when it conveyed
its property, including its electric power plant, to Spruce
Fork Coal Company; the latter company, on November 25,
1914, conveyed the same property to the defendant. About
the time this transfer was made, the Spruce Fork Company
had been declared by the State Public Service Commission to
be a public service corporation, by an order entered in a
proceeding brought by Emma J. Chambers, so that defendant
acquired title to the electric power plant subject to the bur-
dens as well as the privileges of public service. Thereafter
the plant appears to have been operated for some time by the
Spruce Lighting Company, another of defendant's subsid-
iaries, but no formal transfer seems to have been made to it
until March 1, 1916, when the plant was transferred to it by
Boone County Coal Corporation. By agreement between the
latter and the Logan Light and Power Company, dated Feb-
ruary 25, 1916, the Logan Company agreed to operate the
power plant, either through another subsidiary of the Boone
County Coal Corporation, called the Boone Power Company,
or if it desired, to operate it through the Spruce Lighting
Company. There were various other contracts and transfers
made relative to the power plant, until the power business
was finally taken over by the Kentucky & West Virginia
Power Company. The plant at Sharples was dismantled, and
the power for mining operations in the field has since been
furnished by a larger plant at Logan. It is unnecessary to
further detail these various transactions. Up until November,
1920, the Holdred Collieries was furnished power at the rates
prescribed in article 15, either by the Boone County Coal
Corporation, or one of its subsidiaries. In November, 1920,

the public service power company then furnishing the power to plaintiff refused to furnish it at the rate prescribed by that article, because it had been granted a rate by the Public Service Commission which made its rates higher than $2\frac{1}{2}$c per kilowatt hour of direct current, the maximum rate prescribed by the lease. The article also calls for direct current, but beginning on or before November, 1920, the power company refused to maintain the mechanical apparatus necessary to transform the alternating current to direct current, so it could be used in plaintiff's mines and plaintiff was compelled to go to this expense. Up to that time the power company had maintained this machinery. Upon its refusal to do so and to furnish power at the rate prescribed by article 15 of plaintiff's lease, plaintiff notified the Boone County Coal Corporation to furnish the power at the contract rate and likewise to furnish the mechanical apparatus to transform the alternating current it was then receiving to direct current. The lessor refused. Plaintiff was then compelled to pay the higher rate and to furnish the machinery necessary to transform the electric current so it could use it. This action is to recover the difference between the contract rate and the rate plaintiff was required to pay, and also the expense it incurred in maintaining the transforming apparatus; the account runs from November 1, 1920, to March 1, 1923.

Defendant urges various grounds for reversal which we will discuss in order.

Its first proposition is that the obligation imposed upon it under article 15 of the lease was subject to the right of the state under its police power to change it without the consent either of the lessor or lessee, and that since the defendant's subsidiary power companies, to which defendant delegated the duty of supplying electric current under article 15, have been held to be subject to regulation as public utilities, and the defendant itself for a time discharged the same duty as a public utility, its obligation to furnish electric current at the contract rate has been abrogated through the orders of the Public Service Commission.

When the coal mining lease was made the Boone County Coal Corporation was not a public service company, nor was it engaged in public service business. It was not itself sup-

plying electric current to the public. It did not own the capital stock of the Spruce Fork Company, an electric power company, which was then supplying electric power to Boone County Coal Corporation's lessees. Whether the power company at that time had begun furnishing electric current to others, as distinguished from the Boone Corporation's lessees, so as to make it, the Spruce Fork Company, a public utility and as such subject to public regulation does not appear. But even if the Spruce Fork Company was then a public service company, defendant could clearly have performed and could yet perform its obligation under article 15, without becoming a public service company. It may be true that defendant was then, through its subsidiary, causing electric power to be furnished to a number of its lessees, under similar contracts, but this would not make defendant a public utility. The service required under article 15 might be performed by a public utility, but not necessarily so. It could be performed by a private individual or corporation, not subject to public service regulation. Nor can we say that the parties at the time the lease was executed contemplated that the service contracted to be rendered should be of the character of that rendered by a public utility.

The facts in this case are quite different from those in *Wingrove* v. *Public Service Commission,* 74 W. Va. 190, 81 S. E. 734. There the White Oak Fuel Company furnished electric current to the public generally. It did not confine its service to its tenants or employees. In the instant case if we consider the circumstances surrounding the parties at the time the lease was executed and the fact that the defendant was to furnish or cause to be furnished electric power to some ten or twelve lessees for the operation of their respective leaseholds, we could not say that they had in mind a public service, such as would render the lessor subject to public regulation. The owner of an office building frequently contracts to furnish electric current or water or gas for the use of his tenants in rooms occupied by them, but such service does not subject him to regulation as a public utility. Nor can we say that because defendant's subsidiaries, the lessor's agents, that furnished the electric power, were declared to be public utilities by the Public Service Commission

and were as such authorized to charge higher rates than that prescribed by article 15, the defendant was absolved from its obligation under its contract. It contracted to erect or cause to be erected an electric power plant, centrally located, from which it should sell electric power to its lessee. The contract does not in terms provide that this might be done by a subsidiary company, but of course defendant might do through its agents what it might do itself; but if its agent became legally disqualified and could no longer perform the service contracted for, this would not relieve the defendant from its obligation. It might create or obtain another agent to do it or it could furnish the service itself, free from the burden of public regulation. We see nothing in the surrounding circumstances nor in the contract itself which shows that the parties contemplated a service that would be subject to public regulation. Indeed, when Mrs. Chambers petitioned the Public Service Commission to compel the defendant's subsidiary, Spruce Fork Company, to furnish electric lights for her hotel, that company denied it was engaged in public utility service. We do not believe that either the defendant or plaintiff's assignor had any idea that they were contracting for public electric service when they executed the lease. Our Public Service Commission had not then been created, nor had there been much development of public utility law in this state. The contracts between defendant and its lessees were purely private; the rate was to be determined by agreement. The contract merely fixes a maximum and minimum charge, and in some of the leases even the minimum charge was to be determined by the agreement of the parties. Owing to the great increase in cost of producing electricity the price for current has advanced very materially beyond the maximum contract rate. This has placed a great burden upon defendant, owing to the fact that its leases extend over a period of many years. We fully appreciate the situation, but are powerless to grant relief. If the state, through the exercise of its police power, can not change the contract, and it can not, because the service contracted for is a service in which the state has no concern, this court can not change or abrogate the contract by construction, merely because it has become burdensome. "If a party by contract charges himself

with an obligation possible to be performed, he must make it good, unless performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him.'' *McCormick* v. *Jordon*, 65 W. Va. 86, 63 S. E. 778; *Roberts* v. *American Coal & Lumber Co.*, 76 W. Va. 296, 85 S. E. 535. We are therefore of opinion that article 15 is binding upon defendant, notwithstanding the fact that the Public Service Commission declared its subsidiary company to be a public utility, or that the contract has become burdensome to the defendant.

Defendant's obligations under its contract being established, and from which the action of the Public Service Commission in allowing its subsidiary to increase its rates and to discontinue the maintenance of the transformer system did not and could not relieve defendant, its second proposition that it has always performed its contract is not tenable.

Its third proposition is that there is a variance between the allegations in the special counts of the declaration and the proof. The declaration sets forth the contract and specifically shows how the defendant breached it; it alleges that ''the said defendant failed and refused to furnish or cause to be furnished power to said plaintiff *in accordance with the terms of said contract aforesaid.*'' Defendant seems to contend that in as much as the power was furnished to plaintiff, defendant committed no breach of its covenant even though plaintiff was compelled to pay more for it than the contract rate, but this can not be true. Plaintiff was compelled to pay the increased rate. It had no other source from which it could obtain power, and the rate it paid was legally fixed by( the Public Service Commission. Defendant is liable to plaintiff for the difference between the contract rate and the rate plaintiff was compelled to pay. We find no variance between the allegations in the declaration and the proof.

Defendant as a fourth ground claims that plaintiff is estopped from urging defendant's liability under article 15 because it accepted an assignment of the lease, with full knowledge that the electric current then supplied was being furnished by a public utility company; but not so. That assignment was also executed by defendant, and it thereby in express terms agreed that the covenants, stipulations and

conditions contained in the lease and the supplemental agreement in relation there to "shall remain unchanged, and shall continue to be and remain in full force and effect as between the lessor and assignee." At that time the assignor, Spruce Valley Coal Company, was obtaining its power through defendant's subsidiary at the contract rate and in full accord with article 15. The contract was faithfully observed until November, 1920. We do not see how defendant could claim it was prejudiced by plaintiff's conduct. If it desired to relieve itself from its obligation under article 15 it could have done so then, as under article 13 of the lease the assignment of the lease could not have been made without the consent of the lessor, and the lessor knew just as well as did the plaintiff how the supply of electric power was being furnished. Probably neither then anticipated the future increase in the cost of electric current. Plaintiff might well say it would not have accepted the assignment with article 15 eliminated.

The power was thereafter furnished pursuant to article 15, and plaintiff had no grounds for complaint. It violated no duty and in no wise misled defendant. We see no element of estoppel in its conduct and there is certainly none contained in the assignment.

A final objection is made to the amount of the judgment. The lease says: "The price to be agreed upon, which shall not be for more than 2½c per KW hour of direct current as measured by an approved meter to be supplied by the lessor, provided, however, that the minimum charge after one year from date hereof shall be *$1.00 per month per KW of installation.*" Under this provision the plaintiff was entitled to receive direct current. The power company carried its alternating current to the mine, where by means of transformers it was converted into direct current, so plaintiff could use it. For a number of years the power company furnished and maintained the transforming apparatus. In 1919 it was relieved by an order of the Public Service Commission from any obligation to maintain the transforming machinery, and thereafter it supplied only alternating current, charging therefor the rates established by the commission. The power company, on its side, furnished a generator set, rated at 150 kilowatts. That was its rated capacity. No matter how

much current the plaintiff's machinery on its side of the mine, which we will here call the inside, was capable of using, all the current that it could receive through defendant's generator set was 150 kilowatts. Calculations of defendant's witnesses show that plaintiff's machinery was capable of using 255.7 kilowatts per hour. For a number of months plaintiff's mine was idle. During this time it did not use the 150 K. W. minimum. The power company, when the plaintiff used less than the minimum per month, charged monthly for 150 kilowatts, or $150.00. Defendant now claims that the minimum should be based upon the capacity of plaintiff's equipment, and that therefore the minimum should be $255.70 per month, instead of $150.00 per month, contending that the term "installation" in article 15 means the capacity of plaintiff's equipment. It appears from the testimony that the term used is somewhat inapt, but that there are two ways of expressing a minimum charge for electric current,—one on the basis of the "connected load," and the other on the basis of "installation." This minimum charge is based on the theory that one furnishing the current must always be ready to furnish current. It is therefore fair that plaintiff should pay a minimum each month whether it takes current that month or not. But the only amount that could be used by plaintiff was what could pass through the power company's appliances, which we have seen had a capacity of 150 kilowatts. Defendant, as well as its subsidiaries, while they furnished power under the contract fixed that minimum at $150.00 per month. The contract is not clear. Its meaning is extremely doubtful; but the parties construed it themselves for several years. The subsidiaries as well as the defendant in making the minimum charge billed it at $150.00 per month. They therefore placed a practical construction on the contract. If we can consistently with legal rules construe it in the same way it is our duty to do so. *Clark, Trustee,* v. *Sayers & Lambert,* 55 W. Va. 512, 47 S. E. 312; *Smith* v. *South Penn Oil Co.,* 59 W. Va. 205, 53 S. E. 152; *District of Columbia* v. *Gallagher,* 121 U. S. 505. We see no legal reason for placing a different construction upon it; consequently we find no cause for reducing the amount found, and the judgment will be affirmed.

*Affirmed.*