# CHARLESTON.

SUMMIT COAL COMPANY *v.* RALEIGH SMOKELESS FUEL COMPANY

(No. 5075)

Submitted April 13, 1924. Decided April 21, 1925.

1. CONTRACTS—*Court Will Adopt Construction of Ambiguous Contract Placed Thereon by Conduct and Agreements of Parties During Performance.*

The Court will adopt the construction which the parties to an ambiguous contract, by their conduct and express agreements during performance, have placed upon it.  (p. 17).

(Contracts, 13 C. J. § 517).

2.   SAME—*Parties May by Subsequent Agreement Modify Original Contract or Substitute Another Therefor.*

And where the original contract is unambiguous and certain in its terms the parties may by a subsequent agreement, binding them, modify it or substitute therefor another contract.   (p. 18).

(Contracts, 13 C. J. § 104).

3.   TRIAL—*If Evidence is Not Sufficient to Support Verdict for Plaintiff, Court Should Direct Verdict for Defendant on Motion.*

If the evidence in a case is not sufficient to support a verdict for the plaintiff, the court should, on motion of the defendant, direct a verdict for the latter.   (p. 17).

HATCHER, JUDGE, absent.

(Trial, 38 Cyc. p. 1580).

NOTE:  Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.

Error to Circuit Court, Raleigh County.

Action by the Summit Coal Company against the Raleigh Smokeless Fuel Company.  Judgment for defendant, and plaintiff brings error.

*Affirmed.*

*C. M. Ward,* and *C. W. Dillon,* for plaintiff in error.

*Price, Smith & Spilman,* and *McGinnis, Maxwell & McGinnis, Ashton File,* and *W. W. Goldsmith,* for defendant in error.

LITZ, JUDGE:

This writ was awarded upon the application of the plaintiff to the judgment of the Circuit Court of Raleigh County on a directed verdict in favor of the defendant.

The plaintiff, Summit Coal Company, is a corporation operating a coal producing plant at Metalton, Raleigh County. The defendant, Raleigh Smokeless Fuel Company, also a corporation, is engaged in the purchase and sale of coal upon its own account and as agent for others.  With the view of selling coal to the Mathew Addy Steamship & Commerce Corporation, of Cincinnati, Ohio, the defendant obtained from plaintiff and four other producing companies in Raleigh County

separate offers in writing to sell certain amounts of coal, aggregating 120,000 tons, to be delivered between April 1, 1920, and April 1, 1921, at the rate of 10,000 tons per month. The offers were set forth in letters of identical form (except as to the amount of coal) addressed to the defendant. The body of the letter containing the offer of the plaintiff, dated January 2, 1920, follows:

> "This will be your authority to contract for our account 2,000 gross tons Pool 1 or 2 permit, beginning April 1, 1920, and ending March 31, 1921, at a price that will net us $3.85 per net ton less 15c per net ton commission to you. This mine price is based on the present wage scale and should there be a general increase in our field, a proportionate increase is to be added to the contract price. This offer is open to your acceptance until January 10, 1920, and should you accept this offer on or before this date, we agree to ship on your orders the above mentioned tonnage monthly, except for strikes, lockouts and causes beyond our control."

Upon the faith of these offers, as outright proposals of sale to it, the defendant sold to the said Mathew Addy Steamship & Commerce Corporation, by written contract, January 9, 1920, 120,000 tons of coal at the price of $6.312 per ton f. o. b. piers at Hampton Roads, Virginia, such grades as would be acceptable in Pools 1 and 2 of the Tidewater Coal Exchange for shipment between the first day of April, 1920, and the first day of April, 1921, at the rate of 10,000 tons per month. The price fixed, as it seems, is the equivalent of that contained in the offers, of $3.85 per net ton f. o. b. mines.

By letter dated January 8, 1920, and delivered to the plaintiff after the sale to the Mathew Addy Steamship & Commerce Corporation, the defendant accepted the plaintiff's offer of January 2d, in the following language:

> "Referring to your letter of the 2d instant, say that we have contracted for your account 2,000 gross tons Pool 1 or 2 coal per month, beginning April 1, 1920, and ending March 31, 1921, at the price and upon the terms, and for delivery stated in your letter; and you will please accept this as

notice of acceptance of the offer stated in your let-
ter above mentioned, of which you will kindly
acknowledge receipt.''

Both parties treating the offer and acceptance in the two
letters as a sale of the coal to the defendant, all shipments
during the contract period were made by the plaintiff to the
order of, and promptly paid for by, the defendant. Long
after the performance of the contract the plaintiff set up claim
that the coal had been delivered to the defendant as agent
of the plaintiff and that the defendant, having disposed of
the same on its own account, was liable to the plaintiff for
the difference between the contract price and the market
value, amounting to a large sum of money. This is the only
basis for the suit.

The action of the trial court, directing a verdict for the
defendant and rendering judgment thereon, is fully supported
by the record.

Although the plaintiff treated the defendant as purchaser
of the coal during the performance of the contract, it now
assumes a changed attitude by claiming that it did not know
the defendant had sold the coal on its own account to the
Steamship Corporation until 1922, when its first corres-
pondence with that corporation occurred.

The present position of the plaintiff is discounted by the
very fact relied on to excuse delay in its assertion. It is un-
reasonable that the plaintiff would have continued for a year
to ship large quantities of coal to a supposed purchaser· with-
out having some intercourse with such customer. The plain-
tiff proves that it did not know or even inquire the name of
the purchaser to whom the defendant had sold the coal until
several months after beginning shipments under the agree-
ment. Is it reasonable that the plaintiff had been previously
extending credit to an unknown purchaser? This is what its
present contention means; for if the sale had been made by
the defendant on behalf of the plaintiff, as is now claimed,
then the plaintiff would have been compelled to look to the
credit of the unknown purchaser alone, in the absence of
agreement by the defendant to guarantee payment.

August 2d, 1920, the plaintiff as producer, party of the
first part, the defendant, as agent,· party of the second part,

and Matlack Coal & Iron Corporation, as purchaser, party of the third part, entered into a written agreement, whereby the defendant, as agent for the plaintiff, sold to the said Matlack Coal & Iron Corporation the entire output of coal from plaintiff's mines to the amount of 150,000 tons, "subject nevertheless to the prior sale made by the producer (plaintiff) to the agent (defendant) of 16,000 net tons of coal, to be supplied under said contract at the rate of 2,000 tons per month until the full amount of 16,000 net tons of coal shall have been furnished by the producer (plaintiff) to the agent (defendant)." The contract recites:

> "Whereas it is understood between all parties to this agreement that the producer (Summit Coal Company) has heretofore by contract sold to the agent (Raleigh Smokeless Fuel Company) certain coal tonnage on which contract there remains undelivered 16,000 tons of coal which, by the terms of said contract, is to be furnished and shipped by producer (Summit Coal Company) to the agent (Raleigh Smokeless Fuel Company) at the rate of 2,000 net tons per month from the date hereof; and it is understood and agreed between the parties hereto that this agreement is subject in all respects to said contract, and prior sale of said tonnage."

The plaintiff would repudiate those parts of the agreement here quoted upon the theory that they constitute mere recitals, "furnishing a basis for the contract." It is quite true that the prior agreement between the plaintiff and defendant was necessarily considered in arriving at a basis for the new contract; and for that very reason it is presumed that the parties deliberately and correctly interpreted the same. They had before them the contract between the defendant and The Mathew Addy Steamship & Commerce Corporation. The explanation, therefore, confirms the accuracy of the recitals and provisions in the contract, showing an outright sale by plaintiff to the defendant of the coal in question. The Matlack Coal & Iron Company was getting the entire output of the plaintiff's mines, subject to previous sales.

We have said that the parties had before them in preparation of the Matlack contract the prior written agreement

between the defendant and The Mathew Addy Steamship & Commerce Corporation. About this there can be no doubt. E. L. Ellison, President of the Summit Coal Company, in his testimony upon cross-examination admits having seen this contract at that time, although later attempts to change his statement. Whether or not he observed it then is of little moment, however, in determining the fact of its presence on that occasion. J. B. Clifton, president and general manager of the defendant company, states as his impression or recollection that the contract was there, and J. Q. Hutchinson, stockholder and director of the plaintiff company, and who represented it as attorney in the preparation of the Matlack contract, in his testimony makes no denial. But assuming that the Steamship contract was not presented at that time, the situation remains unchanged. The Matlack contract was solemnly and deliberately entered into and there is no showing that any of its parts resulted from fraud or mistake.

The coal market suddenly declined about the middle of November, 1920, and on or about December 1st had fallen below the price named in the letter of January 2, 1920. It appears also that The Mathew Addy Steamship & Commerce Corporation became insolvent or refused to accept more coal from the defendant about December 1st. In this situation, the plaintiff insisting that the defendant was the purchaser, the latter continued to receive and pay for the coal during the remainder of the contract period, thereby sustaining a loss of $10,821.23. No proof or argument is offered to meet the conclusive defense here presented.

The letter of January 2, 1920, is ambiguous. Some of its provisions seem to confer upon the defendant authority to sell the coal as agent of the plaintiff, while others indicate an outright offer of sale by the latter to the former. It stipulates that the coal will be shipped on the orders of the defendant, thereby evincing an intention on the part of the plaintiff to deal only with the defendant. Accordingly, all shipments under the contract were made and charged to the defendant. During performances by the plaintiff the defendant presented a claim amounting to about $15,000.00 for alleged overpayment by it to the plaintiff on account of wage increase, which had been added to the original price of the coal stated in the

letter of January 2, 1920. This claim was settled between the parties for $12,909.91. The plaintiff had no dealings with any·one but the defendant in the settlement of the claim or concerning any other matter relating to the contract.

The following circumstances are relied on by the plaintiff as evidence of its contention that the letters of January 2 and 8, 1920, and the conduct of the parties thereunder, establish the relation of agency between it and the defendant:

(1) The defendant sold in the open market fifteen cars of coal which had been released by The Mathew Addy Steamship & Commerce Corporation during the months of May and June on account of a strike among the railway employees, causing a reduction in traffic, and gave the plaintiff the benefit of the increased price then prevailing, less commissions.

(2) In September the defendant also paid the plaintiff the market price, less commissions, for two cars of coal which had been confiscated in transit by the railway company.

(3) In December the defendant likewise gave plaintiff credit for a car of coal shipped by the plaintiff to a purchaser in Virginia for which the defendant collected the purchase price.

The general manager of defendant testifies that the plaintiff was given the benefit of prevailing prices for the first two items of coal for the reason, as defendant felt, that in as much as it did not have to account for these cars under its contract with The Mathew Addy Steamship & Commerce Corporation, it should in good faith give the plaintiff the advantage of the situation. Payment for these cars on the current market basis, under the circumstances, is indeed very slight, if any, evidence tending to establish the plaintiff's contention. The commissions retained by the defendant were much larger than fifteen cents per ton, the amount stated in the letter of January 2, so that the defendant did not deal with this coal under the contract, as interpreted by either the plaintiff or defendant.

The car of coal involved under the third item does not appear to have been shipped under the contract, and therefore has no bearing upon the controversy.

The evidence is clearly insufficient to sustain a verdict for the defendant. When a contract is ambiguous and of doubtful

and uncertain meaning, and the parties have by their conduct contemporaneous therewith or subsequent thereto, placed a construction upon it which is reasonable, such construction will be adopted by the court. *Clark, Trustee,* v. *Sayers,* 55 W. Va.. 512; *Headley* v. *Hoopengarner,* 60 W. Va. 626; *Myers* v. *Carnahan,* 61 W. Va. 414; *Hall Mining Co.* v. *Consolidated Fuel Co.,* 69 W. Va. 47; *Lovett* v. *West Virginia Central Gas Co.,* 73 W. Va. 40; Williston on Contracts, Sec. 623; Page on Contracts, Sec. 2034; 13 C. J. p. 546. ''Where the terms of a contract are of doubtful meaning, a practical construction placed thereon by the acts of the parties, if consistent with legal rules, is controlling.'' *Holdred Collieries of West Virginia* v. *Boone County Coal Corporation,* 97 W. Va. 109, 124 S. E. 493.

We have in this case more than a practical construction of the contract by the parties. During its performance, on August 2, 1920, in writing, and in December, 1920, by parole, they gave to the contract an agreed construction which was never questioned until long after performance. These unquestioned agreements clearly establish an estoppel against the plaintiff and bar its rights to the relief now sought. *Headley* v. *Hoopengarner,* cited.

Moreover, if the contract based upon the letters of January 2 and 8, 1920, is unambiguous, and therefore not susceptible to construction from the acts of the parties, or if ambiguous, its interpretation from the acts of the parties should have been submitted to the jury, as contended by the plaintiff, there remain nevertheless the written agreement of August and the oral understanding of December, 1920, while the coal was being shipped, that it had been sold outright to the defendant. Whether the original contract was certain in its terms, or of doubtful meaning, the parties substituted therefor, or established as their interpretation of it, the contract evidenced by the written agreement and oral understanding. ''That a written contract, whether under seal or not, may be modified or a new one substituted for it, by a parol contract subsequently made, is well and clearly established as a legal proposition, by our decisions. *Shepherd* v. *Wysong,* 3 W. Va. 46; *Baird* v. *Blaingrove,* 1 Wash. 170; *White* v. *Toncray,* 5 Gratt. 179; *Noyes* v. *Caperton,* 68 W. Va. 13; *Simpson* v. *Mann,* 71

W. Va. 516; *Parkersburg etc. Co. v. Smith*, 76 W. Va. 246; *Producers Coal Co. v. Midland Coal Mining Co.*, 82 W. Va. 311." *Corns-Thomas Engineering & Construction Co. v. County Court of McDowell County*, 92 W. Va. 368, 381.

The judgment of the circuit court is

*Affirmed.*