## In re SALE OF ELECTRICITY TO BE RESOLD.

Docket No. 69319-EU, Order No. 4874.

Florida Public Service Commission.

April 23, 1970.

Edwin L. Mason, Tallahassee, for Mobile Home and Recreation Vehicle Park Owners Association of Florida.

Harry A. Evertz, III, St. Petersburg, and B. Kenneth Gatlin, Tallahassee, for Florida Power Corporation.

Edgar H. Dunn, Jr., St. Petersburg, for Shebs, Inc.

G. Pierce Wood, Tampa, for Tampa Electric Co.

William C. Steel of Scott, McCarthy, Steel, Hector & Davis, Miami, for Florida Power & Light Co.

Bert Lane, Pensacola, for Gulf Power Co.

Prentice P. Pruitt, Tallahassee, for the commission staff and the public generally.

Chairman WILLIAM T. MAYO and Commissioners JERRY W. CARTER and JESS YARBOROUGH participated in the disposition of this matter.

BY THE COMMISSION.

Pursuant to notice, the commission, by its duly designated hearing examiner, Leon F. Olmstead, held public hearings on the above matter during 1969, at Miami on September 3; Fort Lauderdale, September 16; West Palm Beach, September 18; Cocoa, September 19; Daytona Beach, September 30; Ocala, October 1; Winter Park, October 2; Lakeland, October 3; Fort Myers, October 14; Sarasota, October 15; Tampa, October 16; Clearwater, October 17; Pensacola, October 28; Panama City, October 29; Marianna, October 30; and Tallahassee, October 31.

On December 11, 1969, the examiner filed findings of fact and conclusions, which was duly served on all of the participants in this

investigation. To this report, replies, exceptions and motions have been filed by the regulated utilities and the intervenors. The examiner's report is confirmed and the commission now enters its order in this matter.

The exceptions of Schebs, Inc., an intervenor, raise points, some relevant and some irrelevant to this proceeding. This intervenor's exceptions to the form and content of the examiner's findings of fact and conclusions have some validity and the commission now proceeds to cure these deficiencies. However, the attempt of this intervenor to convert this investigation into a rate case is completely beyond the scope of this proceeding and will not be considered by the commission.

An intervenor who participated state-wide in this investigation, Florida Mobile Home and Recreational Vehicle Park Owners Association, has filed a petition to reopen this proceeding for the purpose of offering testimony with regard to the late-filed exhibit no. 45 of Florida Power Corporation and for the further purpose of cross-examining the company's witness with reference thereto. We do not deem it necessary to grant this petition since it appears that the further information that could possibly be developed therefrom would not be helpful or necessary to the commission in entering its order herein. Therefore, this petition is denied.

One of the announced purposes prompting this investigation was to make a determination at the commission level whether or not trailer parks, condominium housing units, apartment complexes, shopping centers, marinas and other such businesses engaged in the resale of electricity, directly or indirectly to the public for compensation, are public utilities within the meaning of chapter 366, Florida Statutes, rendering their resale practices and rates subject to the regulatory jurisdiction of the commission.

The jurisdiction of the commission over regulation of electric utilities is established by chapter 366, Florida Statutes. The statutory definition is found in §366.02, the pertinent portion thereof reads as follows —

> "The term 'public utility' as used herein includes every person, corporation, partnership, association or other legal entity and their lessees, trustees or receivers, now or hereafter either owning, operating, managing or controlling any plant or other facility supplying electricity . . . *to or for the public* within this state, directly or indirectly for compensation . . ." (Italics added.)

The key words to determining the question involved are those underscored in the above quotation. In reselling electricity to his tenants does a landlord supply electricity to or for *the public?*

In Jonas v. Swetland Co., PUR 1928D, 825, 119 Ohio St. 12, 162 N.E. 45, the Supreme Court of Ohio held that a realty company which has not dedicated its property to public use and does not hold itself out to serve electric current to the public at large is not a public utility as a result of its voluntarily rendering electric service to tenants. Also, the Supreme Court of Appeals of West Virginia in Holdred Collieries v. Boone County Coal Corp., 97 W. Va. 109, 124 S.E. 493, held that a coal company furnishing electricity under contract to lessees was not a public utility.

In Story v. Richardson, 198 P. 1057, 186 Cal. 162, 18 ALR 750, the Supreme Court of California held that the owner of an office building who supplied his tenants occupying the building with light, heat, hot water, elevator and cleaning service, did not become a public utility engaged in the transmission and sale of electricity though he supplied electrical energy and steam to people not tenants but occupying property in the vicinity of the building. There, the court in its opinion quoted from other cases as to the test for determining whether or not the use is a public use stating as follows —

" 'The test . . . is . . . whether the public has a legal right to the use, which cannot be gainsaid, or denied, or withdrawn, at the pleasure of the owner.' Farmers' Market Co. v. Philadelphia & R. Terminal R. Co., 142 Pa. 580, 21 Atl. 990."

" 'The essential feature of a public use is that it is not confined to privileged individuals, but is open to the indefinite public. It is this indefiniteness or unrestricted quality that gives it its public character.' Thayer v. California Development Co., 164 Cal. 117, 127, 128, Pac. 25."

Likewise, in Cawker v. Meyer, 133 N.W. 157, 158, 147 Wis. 320, 37 LRA, NS, 510, the Supreme Court of Wisconsin held that the owner of an office and manufacturing building who sold three neighbors surplus heat, light and power left after supplying his tenants does not render the operation of a plan which was intended to supply only his own building a public utility. There the court said —

"It is very difficult, if not impossible, to frame a definition for the word 'public' that is simpler or clearer than the word itself. The Century Dictionary defines it as: 'Of or belonging to the people at large; relating to or affecting the whole people of a state, nation or community; not limited or restricted to any particular class of the community.' The New International defines it as: 'Of or pertaining to the

people; relating to or affecting a nation, state or community at large.' The tenants of a landlord are not the public; neither are a few of his neighbors or a few isolated individuals with whom he may choose to deal, though they are a part of the public. The word 'public' must be construed to mean more than a limited class defined by the relation of landlord and tenant, or by nearness of location, as neighbors, or more than a few who, by reason of any peculiar relation to the owner of the plant, can be served by him. ". . . The statute was intended to include those, and only those, who furnished the commodities therein named to or for the public. It was not intended to affect the relation of landlord and tenant, . . . ."

In Junction Water Co. v. Riddle, PUR 1932B, 302, 108 N.J. Eq. 523, 155 Atl. 887, the Court of Chancery of New Jersey held that an individual supplying several houses owned by him and occupied by tenants with water service through mains and conduits laid partly on his own land and partly in the public streets does not thereby become a public utility. In State ex rel. and to use of Cirese v. Public Service Commission of Missouri, Mo. App., 178 S.W. 2d 788, the Kansas City Court of Appeals of Missouri held that persons manufacturing, distributing and selling electric energy were not a public utility insofar as their facilities and activities were confined to sale of such energy to themselves and their own buildings and tenants thereof. Also, the Missouri Public Service Commission in In Re Fulton, PUR 1930D, 11, held that its jurisdiction did not extend to the activities of a landlord purchasing electric energy in wholesale quantities through a master meter for resale to tenants through sub-meters. The Montana Public Service Commission likewise held in Re Lake-Hubbard Nat. Gas Service, PUR 1928C, 358, that natural gas service to tenants does not constitute public utility service. Also, the New York Public Service Commission in Re New York Dock Co., Case 17687, held that it could have no objection to a company's furnishing steam to a port authority which had bought its property where the company's present method of operation in supplying steam to tenants does not constitute a public utility and that continuing to furnish steam to the transferred properties until the termination of leases and removal of buildings did not alter the company's non-regulated status.

In two Illinois cases, People's Gas Light & Coke Co. v. Ames, 194 N.E. 260, 359 Ill. 152, and State Public Utilities Commission v. Bethany Mut. Tel. Ass'n, 110 N.E. 334, 335, 270 Ill. 183, Ann. Cas. 1917B, 495, the Supreme Court of that state held that the term public utility implies a public use, carrying with it the duty

to serve the public and to treat all persons alike; that the term precludes the idea of service which is private in its nature and is not to be obtained by the public.

In Page v. Andrews, 203 S.W. 273, the Supreme Court of Arkansas held that a cotton planter operating a cotton gin, ginning cotton raised on his plantation by himself, *his tenants* and crop sharers, does not operate a *public* gin within the meaning of an Arkansas statute providing for regulation of public gins.

In Wellesley College v. Attorney General, 49 N.E. 2d 220, the Supreme Judicial Court of Massachusetts held that the serving of food to a comparatively small group of tenants for a short period of time is not serving food *to the public* within the meaning of a statute taxing meals served to the public.

It is our view and we hold that a landlord does not become a public utility under chapter 366 by virtue of his reselling electricity to his tenants. Such a sale is not one *to or for the public*. The purchase of electricity from the landlord is not open to the indefinite or general public but only to particular individuals who are tenants of the landlord. This is simply one service among others which a landlord may provide to his tenants. A tenant who may be dissatisfied with any service provided by a landlord, whether it be the electric service or otherwise, has the option to move to another location where he may find the service more to his satisfaction. Such is not the case where one is served by a true public utility obligated to serve any member of the public who may desire service within its service area. There, the availability of service does not rest upon a special relationship such as that of landlord and tenant but rests upon the duty of the public utility to serve all members of the public indiscriminately.

In view of the foregoing, it is rather clear that landlords engaged in the practice of re-metering and reselling electricity, whether for profit or for allocating the cost of the service, are not included in the statutory definition of public utilities and are not subject to the regulatory jurisdiction of this commission.

This investigation was instituted under the authority of §366.05, Florida Statutes, wherein the commission is empowered to prescribe all rules and regulations reasonably necessary and appropriate for the administration and enforcement of its regulatory powers and duties conferred and imposed by chapter 366, Florida Statutes. Pursuant to this authority the commission has duly adopted the following rules pertinent to this proceeding —

310-6.11 *General.* — (Subsequently revised July 29, 1969)

(3)   All tariffs and rules and regulations of each utility relating to service rendered shall conform to these rules and be filed with and approved by the commission before the same shall be effective. In the event of conflict between a rule of a utility and a provision of these rules the provision of these rules shall prevail.

310-6.02 *Schedules, tariffs and rules to be filed with the commission.* — The schedules of rates, tariffs and rules to be filed with the commission by the utility shall be classified, designated, arranged, and submitted so as to conform to the requirements of current tariff or rate schedule, circulars, orders, rules and special instructions which have been, and may from time to time be, issued by the commission. Provisions of the schedules and rules shall be definite and so stated as to avoid ambiguity or the possibility of misinterpretation, and shall include, together with such other information as may be deemed pertinent, the following:

(2)   Forms of standard contracts required of customers for the various types of service available.

(9)   Rules with which prospective customers must comply as a condition of receiving service, and the terms of contracts required.

(14)   Rules covering the type of equipment which may or may not be connected, including rules such as those requiring demand-limiting devices or power-factor corrective equipment.

§366.03, Florida Statutes, provides that no public utility shall be required by the commission to furnish electricity or gas for resale.

Pursuant to the foregoing, four of the major electric public utilities presently have tariff provisions filed and approved by the commission which prohibit their respective companies from selling electricity to their customers for the purpose of resale.

From the pleadings filed herein and from the testimony and exhibits introduced into evidence at the hearings held, it is not disputed that each of the subject utilities have approved tariffs on file with this commission by which the resale of electricity by their customers is strictly prohibited. The relevant provisions of their respective tariffs are as follows —

FLORIDA POWER CORPORATION: SECTION X, LIMITATIONS OF SERVICE

10.1 *Confinement of Customer's Use.* — Electric Service furnished to a customer shall be rendered directly to the customer, through the Company's individual meter, and shall be solely for the customer's own use. 10.2 *Resales Prohibited.* — In accordance with the laws of the State of Florida, the Company shall not be required to sell electricity to any customer for resale; and, except in the case of municipalities and rural electric cooperatives, no customer shall be permitted to resell any electric energy purchased from the company.

10.3 *Remetering Prohibited.* — Electric Service furnished to customer shall not be remetered by the customer for the purpose of selling or otherwise disposing of electric service to lessees, tenants or others on a metered basis; provided, however, that the customer may, with the consent of the Company, install facilities for remetering when such remetering shall not violate these Rules and Regulations.

## FLORIDA POWER & LIGHT COMPANY: 3, LIMITATION OF USE

3.1 *Resale of Service Prohibited.* — Electric service purchased from the Company shall be used by the customer only for the purposes specified in the application for service, and the customer shall not sell or otherwise dispose of such service. Electric service furnished to the customer shall be rendered directly to him through the Company's individual meter, shall be for• his own use, and shall not be remetered by him for the purpose of selling or otherwise disposing of electric service to lessees, tenants or others, and under no circumstances shall the customer or his agent or any other individual, association or corporation, install meters for the purpose of remetering or reselling or otherwise disposing of service; however, a customer operating a trailer or mobile home park may, with the consent of the Company, install meters for the purpose of allocating the cost of the service to the individual trailers on the basis of service used. A customer engaged in this practice shall sign an agreement provided by the Company containing certain conditions including the provision that he will not resell electric service.

3.2 *Street Crossings.* — The customer will not build or extend his lines across or under a street, alley, lane, court, avenue or other way in order to furnish service for adjacent property through one meter even though such adjacent property is owned by the customer, unless written consent is obtained from the Company. Consent may be given when such adjacent properties are operated as one integral unit, under the same name, for carrying on parts of the same business.

3.3 *Unauthorized Use of Service.* — In case of any unauthorized remetering, sale, extension or other disposition of service, the customer's service is subject to discontinuance until such unauthorized remetering, sale, extension or other disposition of service is discontinued, full payment is made of bills for service calculated on proper classifications and rate schedules, and reimbursement in full has been made to the Company for all extra expenses incurred, including expenses for clerical work, testing and inspections.

## FLORIDA PUBLIC UTILITIES COMPANY: RULES AND REGULATIONS

8. *Metering.* — Company will provide each customer with a meter or meters fo reach applicable rate schedule.

Customer, acting jointly with Company, may install, maintain and operate at his expense such check measuring equipment as desired provided that such equipment shall be so installed as not to interfere with operation of Company's equipment and that no electric energy shall be remetered or submetered for resale to another or others.

GULF POWER COMPANY: APPLICABILITY

Applicable for general service covering the entire electrical requirements of any customer except for service to which another Rate Schedule is applicable. Service to two or more premises shall not be combined nor shall service furnished hereunder be shared with or resold to others. All service shall be taken at the same voltage and from a single delivery point.

TAMPA ELECTRIC COMPANY: CUSTOMER'S RESPONSIBILITIES

2.2.1 *Resale of electrical energy by the customer is not permitted.* — .... Customers are not permitted to extend lines across or under public streets, alleys, courts, lanes, highways or any other dedicated right-of-way to furnish service for adjacent property through one meter, unless written consent is obtained from the company. Consent will be given only when such adjacent properties are operated as one integral unit, under the same name, for carrying on parts of the same business. Customer must obtain and keep currently effective any and all required permits from public authorities for crossing of public ways with electrical facilities.

Without reference to any specific violation of any of the foregoing tariff provisions by any public utility, it will suffice to state that in some areas of Florida the practice of furnishing electricity to customers who in turn re-meter and resell to their respective tenants does, in fact, exist. §366.03, Florida Statutes, clearly prohibits this commission from requiring regulated public utilities to furnish either electricity or gas for resale. It necessarily follows that if the commission cannot require such service we would have no authority to regulate the rates and services of landlords who resell the utility service, thus, absent any restrictive tariff provisions such tenants find themselves at the mercy of their landlords until such time as they are able to move to new locations. The evidence herein indicates rather strongly that in some instances the tenants experience extreme difficulty in finding suitable, if any, locations to which they may move their mobile homes since they become branded as "trouble makers" and the "word" gets around.

Because the re-metering and reselling of electricity is engaged in by customers of the utilities to some degree, it appears that some of the utilities are in technical, if not wilful, violation of their tariffs. While all of the utilities have been engaged for some time in attempts to eliminate the practice by purchasing the distribution systems of the landlords and by requiring in most instances that the landlords sign an agreement to the effect that the service provided to a master meter will not be resold, the practice still exists in some areas of Florida. Thus, it appears, that by a strict interpretation of the law some of the subject utilities are in violation of §366.12, Florida Statutes, which provides —

If any public utility, by any authorized officer, agent or employee, shall knowingly refuse to comply with or wilfully violate any provision of this chapter or any lawful rate, rule or regulation, order, direction, demand or requirement prescribed by the commission hereunder, such public utility shall incur a penalty for each such offense of not more than five thousand dollars to be fixed, imposed and collected by the commission. Each day that said refusal or violation continues shall constitute a separate offense. Each penalty shall be a lien upon the real and personal property of the public utility, enforceable by the commission as statutory liens under chapter 85, the proceeds of which shall be deposited to the credit of the general revenue fund of state.

However, since it does appear that the affected utilities are making a good faith endeavor to eliminate reselling of service, and are intensifying their efforts to purchase the various distribution systems of the landlords, the commission will not consider at this time the invoking of any of the penalty provisions of the foregoing statute. The companies are hereby directed to continue in their acquisition efforts and to furnish the commission with progress reports at intervals of at least once every 90 days from the date of this order.

For future reference the commission hereby announces its interpretation of the tariff provisions of "sub-metering" for the purpose of "allocating the cost of service." We are agreed that it shall be interpreted as —

"Cost of service" is the dollar amount actually billed by the utility, including demand charges. By the provisions of the tariffs, the company's customers may re-meter the electricity for the purpose of allocating the cost of the service to rental units. The term "cost" represents only the monthly energy consumption charge made by the power company to the individual or party responsible for the master meter payments. As used, the term cannot be construed to include the cost of the distribution system behind the master meter, the cost for billing, and other such expenses. To allow expenses of this nature would be going beyond each company's "re-metering" provisions. As aforestated, re-metering is allowed only for the purpose of distributing the bills for the master meter usage to each lessee or tenant according to his use.

Each given electric utility is aware of the master metered situation in its service territory. Therefore, to be as just as possible in this matter, the companies shall investigate the billing policies of the master metered accounts, and when one is found to be reselling the company shall notify in writing the owner of such account that within eighteen months their tariff provision prohibiting reselling of electricity will be strictly enforced, and that violation of the provision will subject the account to disconnection of service.

It is therefore ordered that the regulated electric utilities enforce their respective tariff provision relating to resale of electricity, that each company is hereby required to give notice to all master meter customers of the commission's foregoing interpretation of what constitutes reselling of service and put all such customers on eighteen months' notice that service will be discontinued to those who persist in engaging in the practice of reselling electricity. Prior to such discontinuance of service, the utilities shall publish notice in a newspaper of general circulation in the area of each master meter customer affected that service will be discontinued to the landlord, giving the name and address of the facility so served, at least 90 days prior to the date such service will be discontinued.

It is further ordered that this docket be closed and that any further violations of the subject tariff provision by any of the utilities will be considered on an individual basis.